813 F.2d 1263
 Israel Alicea ROSADO, Plaintiff, Appellee,
v.
Carmen Sonia ZAYAS, Secretary of the Department of Social
Services of the Commonwealth of Puerto Rico,
Defendant, Appellant.
Gaddiel MORALES BURGOS, et al., Plaintiffs, Appellees,
v.
Patria CUSTODIO, Defendant, Appellant.
 Nos. 86-1210, 86-1425.
 United States Court of Appeals,
First Circuit.
 Argued Nov. 6, 1986.
Decided March 10, 1987.
As Amended March 20, 1987.
 
 Marcos A. Ramirez Irrizarry with whom Carlos Del Valle, Ramirez & Ramirez, Hato Rey, P.R., and Hector Rivera Cruz, Secretary of Justice, were on briefs for defendants, appellants in Nos. 86-1210 and 86-1425.
 Jorge A. Pierluisi, Jr., Hato Rey, P.R., with whom Jose Ramon Perez-Hernandez, Old San Juan, P.R., was on brief for plaintiff, appellee in No. 86-1210.
 Miguel Pagan, San Juan, P.R., with whom Eliezer Aldarondo and Aldarondo & Lopez Bras, Hato Rey, P.R., were on brief for plaintiffs, appellees in No. 86-1425.
 Before COFFIN, BOWNES and TORRUELLA, Circuit Judges.
 COFFIN, Circuit Judge.
 
 
 1
 We consider in this opinion two political discharge cases, briefed and argued separately before the same panel, arising out of the November 1984 gubernatorial election in Puerto Rico. Plaintiffs-appellees allege that they were demoted for political reasons in violation of the first and fourteenth amendments when the new administration assumed power in January 1985. Plaintiffs seek both damages and injunctive relief reinstating them to their old jobs. In these interlocutory appeals, we consider only whether the district court, 629 F.Supp. 911, erred in denying defendants-appellants' motions for summary judgment on the ground of qualified immunity.[1]
 
 
 2
 Rather than reiterate the legal principles fully discussed in the opinion issued today in another series of Puerto Rican political discharge cases, see Mendez-Palou v. Rohena Betancourt, 813 F.2d 1255 (1st Cir. March 6, 1987) we simply adopt the analysis set forth in sections II and III of that opinion.[2] We thus discuss here only plaintiffs' particular positions and whether it was clearly established that plaintiffs were protected against dismissal from those jobs on the basis of political affiliation. If plaintiffs did not have clearly established rights to be free from patronage dismissals, then defendants are entitled to immunity from suits for damages, and the district court orders denying summary judgment on that ground must be reversed.
 
 
 3
 1. Alicea Rosado: Regional Director, Department of Social Services.
 
 
 4
 Plaintiff Israel Alicea Rosado, appellee in No. 86-1210, was dismissed from the position of Regional Director for the Caguas Region of the Department of Social Services (DSS), a trust or confidential position under the Puerto Rico Public Service Personnel Act, P.R.Laws Ann. tit. 3, Sec. 1350. With regard to the nature of the position, plaintiff's second amended complaint states only that "political affiliation was neither a de jure nor a de facto job requirement for the effective performance of plaintiff's occupied position in public service." Both parties agree, however, that the duties of a DSS Regional Director are accurately described in a Classification Questionnaire that is part of the record on appeal, and we therefore rely on that description for our analysis of plaintiff's position. See Bonitz v. Fair, 804 F.2d 164, 168 n. 4 (1st Cir.1986).
 
 
 5
 The Classification Questionnaire leaves no doubt that it was not clearly established at the time of plaintiff's dismissal that his job was one for which political affiliation was an improper criterion. Indeed, even if our decision were on the merits today, defendant probably would prevail with her claim that political affiliation is an appropriate requirement for the position of DSS Regional Director. According to the Classification Questionnaire, the Regional Director has a significant impact on the nature of social services programs implemented in his region. Among the Regional Director's job duties are several indicating substantial policy-making responsibility, including:
 
 
 6
 --plans and executes coordination and supervision program adjusted to the special needs of the local region in order to achieve the Agency objectives;
 
 
 7
 --interprets the state services plan for the local offices, including discussion of the services required and the goals and achievements the Department expects in the rendering of those services;
 
 
 8
 --participates in planning, preparation and evaluation of the organizational patterns, policies, rules and reference material;
 
 
 9
 discusses with supervisors and subordinates areas of special needs and gaps in the programs;
 
 
 10
 --promotes and establishes changes and reinforces the existing conditions to improve services and programs.
 
 
 11
 In addition, the Regional Director is responsible for evaluating the Department's performance at the local level, and reporting his conclusions to the central office, for representing the department at meetings related to the department's programs, and for establishing and maintaining positive relations with local civic groups and others. In short, as the Classification Questionnaire states, the Regional Director is "the representative of the Social Services Secretary at the regional level." Moreover, unlike the non-partisan functions of the plaintiffs in Branti v. Finkel, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), who were assistant public defenders, Alicea Rosado's tasks involved the politically sensitive issue of the provision of social services. In light of the significant policymaking and spokesperson functions of the Regional Director position, and the relationship of those functions to partisan political interests, we think it beyond doubt that it was not clearly established that plaintiff Alicea Rosado was protected against a politically motivated demotion.
 
 
 12
 2. Morales Burgos: Director of Bureau of Statistics, Economic and Social Planning Program of Planning Board.
 
 
 13
 Plaintiff Gaddiel Morales Burgos, one of the appellees in No. 86-1425, was dismissed from his position as Director of the Bureau of Statistics for the Economic and Social Planning Program of the Planning Board (Statistics Director), a position classified as trust or confidential by the Puerto Rico Public Service Personnel Act. P.R.Laws Ann. tit. 3, Sec. 1350. In his complaint, plaintiff alleges only that "employees of the Planning Board of Puerto Rico duties or functions were neither normative nor policy making ones ... [and do not] participate in the formulation of the public policy of the Planning Board of Puerto Rico." Again, however, the record contains an undisputed document detailing the responsibilities of plaintiff's position, and we rely upon this Job Description to consider whether defendant Patria Custodio is entitled to qualified immunity for plaintiff's demotion.
 
 
 14
 Plaintiff's work--involving statistics--might at first glance seem devoid of partisan political concerns. But the Statistics Director appears to have a significant role in helping to make economic and social policy for the Commonwealth. The Statistics Director studies and analyzes complex economic and social planning problems and prepares reports with alternatives and recommendations. He also advises the Director of the Program on various matters, including the development of the Puerto Rican economy, and counsels the Director on presentations to be made before legislative and executive bodies. The Statistics Director also appears as spokesperson for the Planning Board in public and administrative hearings, and in committees, forums and other activities that concern the analysis of economic and social statistics. Although the tools of the Statistics Director's job are numbers, the substance of his work involves analysis and planning in the politically charged areas of economic and social development. This work, combined with his representative functions, convinces us that it was not clearly established that the Statistics Director was entitled to protection from political discharge.
 
 
 15
 3. Garcia: Director of Bureau for Consultation on Land Use, Physical Planning Program of Planning Board.
 
 
 16
 Plaintiff Sigfrido Garcia, the other appellee in No. 86-1425, was dismissed from his position as Director of the Bureau for Consultation on Land Use for the Physical Planning Program of the Planning Board (Land Use Director), a trust or confidential position under the Puerto Rico Public Service Personnel Act. P.R.Laws Ann. tit. 3, Sec. 1350. We once again rely upon an uncontested Job Description to determine whether it was clearly established that the Land Use Director was protected from demotion based on political affiliation.
 
 
 17
 The Land Use Director has substantial responsibility for establishing and implementing policy regarding the use of public and private land in Puerto Rico, an issue we consider to implicate partisan political concerns. We list several of his functions:
 
 
 18
 --Coordinates, among government agencies at the executive level, the processing of substantial projects that depart from usual procedures;
 
 
 19
 --Takes final action on private and public projects pursuant to Planning Board instructions after evaluating the projects and discussing them with technical personnel;
 
 
 20
 --Plans and supervises land use consultations to assure compliance with the President and Program Director's guidelines;
 
 
 21
 --Attends meetings of the Board and makes recommendations regarding consultations on the use and development of land;
 
 
 22
 --Prepares and writes, with technical personnel, norms and amendments to the planning rules;
 
 
 23
 --Safeguards the smooth operation of the Subprogram to ensure that the Board's policies are carried out through its regulations, guidelines, norms and procedures.
 
 
 24
 The Land Use Director also has communicative and spokesperson functions, including: revising and correcting reports and decision letters issued by the Board on land development projects; writing reports for the signature of the President and Director of the Program concerning land use and development; representing the President and Director of the Program before legislative commissions; testifying in court cases involving the Board. This broad range of duties in the area of land use and development leads to the conclusion that it was not clearly established, at the time of plaintiff's dismissal, that the Land Use Director was protected from political discharge.
 
 
 25
 For the foregoing reasons, the orders of the district courts are vacated and the cases are remanded with instructions to enter summary judgment for defendants on the damage claims on the basis of qualified immunity.
 
 
 26
 TORRUELLA, Circuit Judge (dissenting).
 
 
 27
 These cases and those that accompany them[3] are part of the "Saturday night massacre" that I predicted in Jimenez Fuentes when I stated that ruling would "open [ ] the flood gates for the swinging of the patronage axe[s]." Jimenez Fuentes, 803 F.2d at 1, 16 (1st Cir.1986) (Torruella, J., dissenting). Although my remarks are directed principally at the two appeals in which I am a member of the panel, Nos. 86-1210 and 1425, because of the manner in which the opinions are structured, I must also make passing comments on the other jointly-decided appeals. See footnote 3 below.
 
 
 28
 My first comment is related to what I perceive to be a double standard in the application of the doctrine of qualified immunity. This doctrine, which has been the subject of various Supreme Court decisions in recent years, establishes that an official is entitled to immunity if at the time of the challenged action the statutory or constitutional right allegedly violated was not "clearly established." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); Davis v. Scherer, 468 U.S. 183, 104 S.Ct. 3012, 3020 n. 12, 82 L.Ed.2d 139 (1984). As the Supreme Court stated in Mitchell v. Forsyth, 472 U.S. 511, 105 S.Ct. 2806, 2816, 86 L.Ed.2d 411 (1985), in determining whether the official will receive immunity:
 
 
 29
 All [the appellate court] need determine is a question of law: whether the legal norms allegedly violated by defendant were clearly established....
 
 
 30
 (Emphasis supplied). The jurisprudential development of this doctrine makes it abundantly clear that the Supreme Court is referring to statutory or constitutional rights, not the facts to which those rights may be applicable. See Harlow v. Fitzgerald, 457 U.S. at 819, 102 S.Ct. at 2738. Procunier v. Navarette, 434 U.S. 555, 565, 98 S.Ct. 855, 861, 55 L.Ed.2d 24 (1978); Wood v. Strickland, 420 U.S. 308, 322, 95 S.Ct. 992, 1001, 43 L.Ed.2d 214 (1975); Pierson v. Ray, 386 U.S. 547, 554, 87 S.Ct. 1213, 1217, 18 L.Ed.2d 288 (1967).
 
 
 31
 Notwithstanding the above language, this Circuit has, in political discrimination cases, been looking to the facts of each job description involved as determinative of the outcome of those cases. Jimenez Fuentes, supra.
 
 
 32
 The use of a factual analysis by this Circuit is not only contrary to Mitchell, but has lead to the interminable ad hoc litigation, job description by job description, of which the present appeals are an example. See Rodriguez Rodriguez v. Munoz Munoz, 808 F.2d 138, 149, (1st Cir.1986) (Torruella, J., dissenting). More important is that by the use of such an approach, the law will never be "clearly established" except for the specific factual setting which has been adjudicated, i.e., any variation in the job description from one administration to another will mean that the "law" is not "clearly established" until that job description is re-litigated.
 
 
 33
 As previously indicated, this Court has not applied the Mitchell rule in a uniform manner. In a recent non-Puerto Rican political case, Bonitz v. Fair, 804 F.2d 164, (1st Cir.1986), involving the strip searches of committed inmates, we applied the correct Mitchell test in denying qualified immunity to prison officials, "finding that the constitutional right to be free from an abusive strip search was clearly established at the time of the search [in 1982]." Slip op. at 166 (emphasis supplied). The Court cited extensive Supreme and lower court precedent covering the period 1973-1979 as support for the legal principle in question, i.e., that inmates did not forfeit all constitutional protections by virtue of their confinement in prison. Id. at 170. This Court indicated in that case that "since ... immunity depends only upon the clarity of the right allegedly violated, the only 'facts' we need to know are those that constitute the harm alleged by the plaintiff." Id. at 168 (emphasis supplied). See also Mitchell, 105 S.Ct. at 2816. With all due deference, I do not see the majority in the present appeals as applying those strictures with equal force to the cases before us.
 
 
 34
 At the time of the present discharges, 1985, Branti v. Finkel, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), and Elrod v. Burns, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1975), were clearly established law. See de Abadia v. Izquierdo Mora, 792 F.2d 1187 (1st Cir.1986) (Torruella, J., dissenting) (Appendix A at 1209, citing numerous circuit and district court cases in which Branti and Elrod were relied upon between 1980-1984). I cannot see how it is possible to say that Branti was not the clearly established law in 1985.
 
 
 35
 The majority's application of the Jimenez Fuentes' two-part analysis seems to get more vague with the passage of time. The majority now states that in determining whether the position at issue relates to partisan political interests or concerns, Jimenez Fuentes, 803 F.2d at 6, "there need not exist presently a political disagreement over the proper role of government in the particular area of governance at issue. The position at issue need only involve 'decision making on issues where there is room for political disagreement'." See Mendez Palou v. Rohena Betancourt, 813 F.2d 1255, 1258 (1st Cir.1987) (emphasis in the original). This is no standard at all, it is a huge dragnet from which no governmental position can escape. Politicians can potentially disagree on anything and everything. Under the majority's ever-expanding concept even janitorial positions could be political as it could be argued that the maintenance and appearance of public facilities could be the subject of political disagreement at some point in time. The majority's dragnet emasculates Branti.
 
 
 36
 Furthermore, the analysis suggests an impermissible shifting of the burden of proof regarding the existence of partisan concern. The opinion in the companion cases states that when a plaintiff "has neglected to indicate why he or she falls within the sphere of protection ... we must look beyond the plaintiff's bare allegations...." Mendez Palou, at 1260. Yet the plaintiff does not bear the burden of proof on the issue of partisan concern, as the Supreme Court clearly indicated in Branti. "[T]he ultimate inquiry is ... whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." 445 U.S. at 518, 100 S.Ct. at 1295. The plaintiff need only allege that a politically motivated firing took place. That the firing might have been justified under the Branti exception is a defense that must be pleaded and proven by the defendant.
 
 
 37
 Applying the majority's current analysis, it is not surprising that case No. 86-1555 results in the conclusion that the Assistant Secretary for Special Services of the Department of Agriculture, a position which merely deals with subprograms related to "marketing regulations governing farming and animal husbandry products, the analysis and registry of farming products, the control of plagues in plants, and the inspection and certification of fresh and processed farming products," "involve[s] intensely partisan political interests and concerns." Mendez Palou, at 1261. It borders on the comical to conclude that a determination of which insects should be sprayed, depends on whether one is a Democrat or Republican (the official making the determination, that is). It might be more in line with Branti were we to conclude that such a position is exactly the type of "technical or professional" position in which partisan politics should play no part. Id. at 1258, 1261; de Choudens v. Government Development Bank of Puerto Rico, 801 F.2d 5, 10 (1st Cir.1986) (en banc).
 
 
 38
 In No. 86-1631, the Deputy Executive Director for Special Affairs for the Aqueduct and Sewers Authority, a position created to carry out "activities of an administrative nature" also fails to elude the new dragnet standard. The argument here is that since this authority deals with drinking water and the sewage service, "the occupant of the position could potentially deal with matters of partisan interest or concern on a regular basis." Mendez Palou, at 1262 (emphasis supplied). This non-test tries to both broaden the scope of the position ("could potentially") to bring it within Elrod, 327 U.S. at 368, 96 S.Ct. at 2687, and at the same time attempts to eliminate the obviously equivocal speculation inherent in its formulation by using language which is specific ("regular basis"), but which is therefore inconsistent. Obviously a situation cannot be both "potential" and at the same time be carried out on a "regular basis." All that this language does is cloud the real fact that we are dealing with a non-political technocrat. Cf. de Choudens, 801 F.2d at 10.
 
 
 39
 Case No. 86-1267 involves another non-political technocrat, the Director of Administration for the Environmental Quality Board (EQB). Contrary to the panel's analysis, the official job description for that position provides no basis for concluding that the Director's role is connected with the partisan political goals of the agency. He deals with purely administrative technical and professional matters. Cf. de Choudens, 801 F.2d at 10. The powers of the Director of Administration derive from the President of the EQB's delegation of the power to direct the agency's "technical and administrative activities." P.R.Laws Ann. tit. 12, Sec. 1130(2). He is authorized to formulate and establish public policy only with regard to this technical and administrative area, and his advice to the President of EQB is so limited.
 
 
 40
 There is no basis on the record as stated in the panel opinion to determine that the Director's role is connected to partisan politics, considering the limitations imposed upon an interlocutory review by Mitchell v. Forsyth, 105 S.Ct. at 2806. See Bonitz v. Fair, 804 F.2d at 167-69. There is no basis for concluding that the Director went beyond purely technical and professional matters. Cf. de Choudens, 801 F.2d at 10.
 
 
 41
 It may well be that the term "administrative," as employed to describe this particular position, does embrace policies, programs, and decisions as to which party values and objectives are directly relevant. At this stage of the proceedings, however, we cannot speculate or hypothesize the existence of facts that would tend to support defendant's position. Rather, a request for immunity in this sort of case is premature if, on interlocutory appeal, the plaintiff's allegations and the official job description do not demonstrate any involvement in advice, decisionmaking, or communication serving partisan objectives or values.
 
 
 42
 After all, Elrod marked an important turning point in first amendment doctrine by creating a broad blanket of protection for most public employees. 427 U.S. at 373, 96 S.Ct. at 2689. Branti, moreover, clearly established that even a public employee who engages in policymaking, has access to confidential information, or communicates official ideas may still be protected from politically motivated dismissal, provided the policymaking, confidential information, or communication does not relate to any partisan political interest or concern. 445 U.S. at 519, 100 S.Ct. at 1295.
 
 
 43
 I recognize, of course, that the revelation of broader, politically significant dimensions to the position of Director of Administration might command a conclusion that the position was unprotected or that plaintiff's constitutional right was at least not "clearly established," but this is not the situation faced today by the panel on this appeal.
 
 
 44
 I therefore conclude that the hiring authority has not demonstrated that defendant Rohena-Betancourt was entitled to immunity from an action for damages at the present time. The relevant facts regarding the position of Director of Administration fail to convince me that plaintiff's constitutional right to be protected from politically motivated discharge, Branti, 445 U.S. at 518, 100 S.Ct. at 1294, was not clearly established at the time of his dismissal. Bonitz, 804 F.2d at 166-69. Consequently, the decision of the district court to deny defendant's motion for summary judgment should have been affirmed in that case.
 
 
 45
 In case No. 86-1210, the position in question is that of Regional Director of the Department of Social Services. Contrary to what was stated in Bonitz ("the only 'facts' we need to know are those that constitute the harm alleged by the plaintiff"), the majority relies on the allegations of defendant for determining the appropriateness of political affiliation. It discards plaintiffs' allegations in the complaint as well as in other pleadings (see Appellee's Brief at 6-7) and relies solely on information contained in the Classification Questionnaire, which it indicates "[b]oth parties agree ... accurately described" the duties of that job. Ante, at 1265. As I read the record, however, that is not the case.
 
 
 46
 Plaintiff-Appellee, although not challenging the existence of the Classification Questionnaire, did question the accuracy of that information as being demonstrative of the job's duties and attributions. See Appellee's Brief at 5-7. This puts at issue material facts within the meaning of Rule 56, and thus summary judgment is inappropriate. The argument that the questionnaire is sufficient to establish that defendant-appellant acted objectively reasonable and is entitled, solely on the basis of the questionnaire, to qualified immunity from damages, is not a valid argument because there is no showing on this record that defendant-appellant relied or even had knowledge of this document before demoting plaintiff-appellee.[4] The situation is similar to one in which a police officer arrests without probable cause and then discovers incriminating evidence which would have validated the arrest. Clearly evidence as to which the officer was unaware at the time of evidence cannot be used to determine if there was objective probable cause to arrest. Equally, the defendant-appellant could not have acted in objective good faith regarding the employee's job, by taking into consideration objective indicia (i.e., the Classification Questionnaire) as to which she had no knowledge.
 
 
 47
 It should also be pointed out, that appellant's theory before the district court was based on appellee's "policy making functions and duties" and "confidential position." See "The Material Issues of Law, Memorandum of Law in Support of Motion For Summary Judgment," Record Appendix at 51. Under Branti, appellant had the burden of proof of showing party affiliation was an appropriate requirement. Branti, 445 U.S. at 518, 100 S.Ct. at 1294. In my opinion a reading of the questionnaire, assuming it is properly before us, does not on its face establish appellee as a policymaker. At best it shows an employee who carries out policy, not one who makes it. The questionnaire needs additional explanation, it needs testimonial evidence. As it stands it is insufficient to support a summary judgment motion.
 
 
 48
 Case No. 86-1425, involving the Director of the Bureau of Statistics of the Economic and Social Planning Program of the Planning Board of Puerto Rico, presents to me the clearest example of the politicalization by this Court of what is undoubtedly a non-political position. This position, which can best be described as one which supervises and directs the collection and interpretation of statistical data, is a classic example of a technocrat: an "employee [who] is responsible only for duties that are measured solely by strictly technical or professional criteria." Mendez Palou, at 1258.
 
 
 49
 The fallacy in the majority's conclusion regarding appellee's position is readily seen when we compare his duties with those of the incumbent in the de Choudens case. There we ruled en banc that the position of Senior Vice-President for the Finance Area of the Government Development Bank of Puerto Rico was not a position for which party affiliation was an appropriate requirement, despite holding that agency to be a politically sensitive one. Our ruling that de Choudens' position was non-political was made notwithstanding that she was "a staff official who, ... [held] a policymaking, confidential, and communicative position", "head[ed] one of the Bank's three main operations areas, the Finance Area", "was a member of the Bank's Loan Committee and sometimes acted as interim President", "gave advice to the President and the Board of Directors on financial matters within her area", and "was indeed an agency spokes-person." de Choudens, 801 F.2d at 9. Nonetheless, we concluded that de Choudens was merely a technocrat. If we found that de Choudens did not hold a political position in the face of those facts, I fail to see how we can rule otherwise in this case. Both de Choudens and the statistics director here in question, basically engage in the recopilation of numerical data and its interpretation for the higher ups, who are the ones that make the policy decisions.
 
 
 50
 The majority requires that the Statistical Director "clearly establish[ ] that [he] ... was entitled to protection from political discharge," at 1266 (emphasis supplied). This constitutes an unfortunate mistatement of the law. This standard improperly shifts the burden of proving the appropriateness of party affiliation from defendant, where it belongs, to the employee-plaintiff, where it does not. See Branti, 445 U.S. at 518, 100 S.Ct. at 1294. ("the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement") (emphasis supplied). Not only is there no doubt that the burden of proof is on defendant/hiring authority but the burden is a heavy one, the Supreme Court requiring that the hiring authority prove that "party membership [is] essential to the discharge [of] the employees' governmental responsibilities." Id. (emphasis supplied). Additionally, this burden is further augumented by the requirements placed on the moving party under Rule 56. See Harlow v. Fitzgerald, 457 U.S. at 816 n. 26, 102 S.Ct. at 2737 n. 26; Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962).
 
 
 51
 Yet throughout these appeals, the majority has improperly shifted these burdens. For example, in case No. 86-1425, in which the employee was the Director of the Bureau for Consultation on Land Use of the Physical Planning Program of the Planning Board, the majority again applies the wrong burden of proof in looking to the "uncontested Job Description to determine whether it was clearly established that the Land Use Director was protected from demotion based on political affiliation." At 1266, 1267. It then concludes that the description grants the position "substantial responsibility for establishing and implementing policy regarding the use of public and private land in Puerto Rico." Id. at 1266. But a reading of the original OP 16 in Spanish reveals that plaintiff's duties are carried out pursuant "to the directives of the President [of the Planning Board] and the Director of his program and the established work plan." See Appellant's Record Appendix at 109 (my translation). Appellee just carries out the policies established by appellant. Furthermore, it is clear that most of the duties described in OP 16 are technical in nature. See de Choudens, supra. In fact the experience required for this job is for "the realization of highly technical work." See Record Appendix at 113, paragraph 16 (my translation). This position is also protected from political discharge by de Choudens.
 
 
 52
 Finally, I doubt seriously whether we should be considering these cases at all, because of the pendent local law damage claims. Interlocutory appeals are reserved for "final decisions" whose resolution can potentially dispose of an action entirely. See Mitchell v. Forsyth, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). Mitchell allowed an interlocutory appeal of the denial of summary judgment on qualified immunity, where the suit was solely one for damages under 42 U.S.C. Sec. 1983. That opinion explicitly left open the question whether such an interlocutory appeal would be proper when there was also a claim for injunctive relief and did not consider the possibility of a pendent state law damage claim. See Mitchell, 105 S.Ct. at 2812 n. 5.
 
 
 53
 In De Abadia v. Izquierdo Mora, 792 F.2d 1187 (1st Cir.1986), the majority found that an interlocutory appeal was proper, despite a continuing claim for injunctive relief, because a decision in favor of qualified immunity would be final as regards the suit against the official in his or her personal capacity. The majority explained:
 
 
 54
 Although we recognize a public official's obligation to defend a suit brought against him in his public capacity, the emotional, and perhaps physical, responsibility is not as great. "[T]he fear of being sued and held personally liable for damages is a far cry from a suit for reinstatement or injunctive relief, which public officials face regularly in the course of performing their duties."
 
 
 55
 Id. at 1189 (citation omitted). But this justification has no merit where, as in the present cases, the official also faces a suit in his or her personal capacity for damages on a local law claim based on the same circumstances.[5] These interlocutory appeals do not render personal capacity damage claims "final" at all. Instead, they just give the defendants, who are apparently being voluntarily defended and indemnified by the Commonwealth,[6] one more opportunity to wear down the plaintiffs through motions and appeals (which will, no doubt, wear down the judiciary, as well).
 
 
 56
 I dissent in the panel's decision in cases Nos. 86-1210 and 86-1425.
 
 
 
 [1]
 Plaintiffs Gaddiel Morales Burgos and Sigfrido Garcia also allege in their complaint that defendants violated their right to procedural due process. We do not consider this aspect of the case, however, because the issue was not discussed on appeal
 
 
 [2]
 We disagree with the dissent's assertion that we have departed from the approach to qualified immunity previously adopted in this Circuit. In Bonitz v. Fair, 804 F.2d 164 (1st Cir.1986), the right at issue was one applicable to all persons, and the qualified immunity question therefore simply was whether it was clearly established that an individual had a right to be free from an abusive strip search like the one alleged by the plaintiffs in that case. In these cases, however, the right asserted by plaintiffs is not universally protected; an individual employed by the government is protected against a politically motivated discharge only if "party affiliation is [not] an appropriate requirement for the effective performance" of his or her job. Branti v. Finkel, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980). Thus, in asking the qualified immunity question, we must recognize the individual nature of the right allegedly violated and ask whether it was clearly established that someone in the particular position before us was entitled to protection from discharge. See Bonitz, 804 F.2d 164, 168 n. 4. Any other approach would make the doctrine of qualified immunity meaningless in this area of law. If the question were only, in general, whether there was a clearly established protection against political discharge, the answer always would be yes, and no defendant would be granted immunity. Even the governor would be denied qualified immunity for discharging top agency heads
 
 
 [3]
 See Mendez-Palou v. Rohena-Betancourt, No. 86-1267; Rodriguez Ramirez v. Gonzalez-Chapel, No. 86-1555; Gimenez Boehm v. Riefkohl, No. 86-1631; Monge-Vazquez v. Rohena-Betancourt, No. 86-1431; and Ortiz Lebron v. Santiago Nieves, No. 86-1661
 
 
 [4]
 This lack of reliance on the OP 16 form is equally applicable to all of the present appeals
 
 
 [5]
 The majority in Abadia, in a footnote at the conclusion of its opinion, implied that these pendent state claims would be precluded by Pennhurst State School & Hospital v. Halderman, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). Pennhurst, however, concerned pendent state claims against state officials in their official capacity and where "the relief sought and ordered has an impact directly on the State itself." Id., 465 U.S. at 117, 104 S.Ct. at 917. Suits against state officials in their personal capacity, on the other hand, are not suits against the employing governmental entity and, accordingly, do not raise the eleventh amendment concerns underlying Pennhurst. See Kentucky v. Graham, 473 U.S. 159, 105 S.Ct. 3099, 3106, 87 L.Ed.2d 114 (1985)
 
 
 [6]
 The Commonwealth's voluntary and gratuitous defense of personal capacity suits against Commonwealth officials does not bring this case within Pennhurst's prohibitions. Any damages assessed will be against the official personally, and not the Commonwealth. Whether the Commonwealth makes a gift to the official to cover the damages is a matter between the Commonwealth and the taxpayers; it does not concern this court. To the extent this indemnification would make these suits ones against the Commonwealth, the voluntary nature of the indemnification would constitute a waiver of any sovereign immunity from suit. See 32 L.P.R.A. Sec. 3085