**Mildred I. GOYCO de MALDONADO,**
**Plaintiff, Appellee,**

v.

**Jose A. RIVERA, etc.,**
**Defendant, Appellant.**

No. 87–1872.

United States Court of Appeals,
First Circuit.

Heard Feb. 1, 1988.

Decided June 9, 1988.

Carlos Del Valle with whom Hector Rivera Cruz, Secretary of Justice, Com. of Puerto Rico, Rafael Ortiz Carrion, Sol. Gen., Marcos A. Ramirez Irrizarry, Jose A. Sanchez Alvarez and Ramirez & Ramirez, Hato Rey, P.R., were on brief, for defendant, appellant.

Pedro Miranda Corrada, Hato Rey, P.R., with whom Hector Urgell Cuebas, Santurce, P.R., was on brief, for plaintiff, appellee.

Before CAMPBELL, Chief Judge, TORRUELLA and SELYA, Circuit Judges.

SELYA, Circuit Judge.

Mildred I. Goyco de Maldonado, plaintiff-appellee, sued for damages, reinstatement, and ancillary relief in the aftermath of her dismissal on February 11, 1985 as first vice president of the Puerto Rico Housing Bank and Finance Agency (Housing Bank). The gravamen of her action was twofold: she claimed (1) that she lost her job because of her ties with a particular political party in derogation of her first amendment associational rights, and (2) that she had been denied due process. Defendant-appellant Jose A. Rivera, president of the Housing Bank, sought partial summary judgment on the first amendment claim, asserting that he was qualifiedly immune from the claim for money damages. *See generally Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). The district court rejected Rivera's qualified immunity argument, *Goyco de Maldonado v. Rivera*, 671 F.Supp. 100, 102–03 (D.P.R.1987), but simultaneously granted him summary judgment on the due process claim (ruling that plaintiff had no constitutionally protected property interest in the position). *Id.* at 103. Defendant filed this interlocutory appeal.

## I

The ground we must traverse is, essentially, all too familiar. This is but the latest in "the long, gray line of suits brought pursuant to 42 U.S.C. § 1983 in the aftermath of Puerto Rico's 1984 gubernatorial election." *Figueroa–Rodriguez v. Lopez–Rivera,* Nos. 87–1319, 1320, slip op. at 2 (1st Cir. Apr. 22, 1988). *See generally Juarbe–Angueira v. Arias,* 831 F.2d 11, 12–13 (1st Cir.1987) (listing typical cases), *cert. denied,* —— U.S. ——, 108 S.Ct. 1222, 99 L.Ed.2d 423 (1988). Like those who have marched before her, Goyco de Maldonado hoists the *Elrod–Branti* banner. *See Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980).

We are mindful of the narrowness of our charge. Our role is "... [to] consider only the isthmian question of whether the denial of partial summary judgment based on qualified immunity was proper." *Fontane–Rexach v. Puerto Rico Electric Power Authority,* No. 87–1801, slip op. at 3 (1st Cir. Apr. 22, 1988) (citing *Mitchell v. Forsyth,* 472 U.S. 511, 524–30, 105 S.Ct. 2806, 2814–17, 86 L.Ed.2d 411 (1985)). Because of this, we cannot at this time properly take a view of any other matters contained in the district court's opinion. *Id.*

■ Where qualified immunity is the issue, the relevant query is whether, at the time of the challenged employment action, "it was clearly established that employees in the *particular positions* at issue, in light of the responsibilities inherent in those positions, were protected from patronage dismissal." *Mendez–Palou v. Rohena–Betancourt,* 813 F.2d 1255, 1259 (1st Cir.1987) (emphasis in original). If not, qualified immunity applies, *e.g., Nunez v. Izquierdo–Mora,* 834 F.2d 19, 21 (1st Cir.1987) (per curiam); *Juarbe–Angueira,* 831 F.2d at 13–14, and the state actor/defendant is entitled to partial summary judgment immunizing him or her against the claims for money damages. Under the model which we have constructed for handling such cases,

we focus at this intermediate stage of the litigation exclusively upon the nature of the position which appellee held and the question of whether, at the time, it was clearly established that one in [appellee's] job capacity was protected against patronage dismissal.

*Fontane–Rexach,* slip op. at 3; *see also Mendez–Palou,* 813 F.2d at 1257–59.

## II

Our independent examination starts with a consideration of the Housing Bank and the character of the position held by plaintiff in that agency. The bank is an instrumentality of the executive branch of Puerto Rico government, *i.e.,* a public corporation attached to, and functioning as an adjunct of, the Commonwealth's Department of Housing. *See* P.R.Laws Ann. tit. 3, § 441e (1973); P.R.Laws Ann. tit. 7, § 901 *et seq.* (1974). The enabling legislation declared that the Housing Bank was created:

For the purpose of assisting the Government of the Commonwealth of Puerto Rico in its housing programs, and of developing more effectively its governmental responsibility of promoting the economy of Puerto Rico and the welfare of its inhabitants....

P.R.Laws Ann. tit. 7, § 901 (1974). In particular, the bank's mission includes helping the government "in the discharge of its functions and duties with respect to the development of homes and the promotion of public welfare in Puerto Rico...." *Id.* at § 917. To achieve such important ends, the Housing Bank has been granted a host of powers. *See, e.g., id.* at §§ 910, 911.

In short, this institution is the driving force behind the Commonwealth's efforts to bring decent, affordable housing to persons and families of modest means. As such, the bank itself can plainly be said to be charged with a "politically sensitive mission." *Mendez–Palou,* 813 F.2d at 1260. This conclusion, we hasten to add, squares with our earlier assessment that other offshoots of the Department of Housing are bound up in the fabric of partisan political concerns. *E.g., Collazo Rivera v. Torres Gaztambide,* 812 F.2d 258, 260–61 (1st Cir.

1987) (Rural Housing Administration); *Jimenez Fuentes v. Torres Gaztambide*, 807 F.2d 236, 241–44 (1st Cir.1986) (en banc) (Urban Development and Housing Corporation), *cert. denied,* —— U.S. ——, 107 S.Ct. 1888, 95 L.Ed.2d 496 (1987).

The fact that the *agency* deals in politically significant matters does not end this phase of our investigation. As the Court has instructed, we must inevitably focus on whether the *position* at issue itself relates "to partisan political interests ... [or] concerns." *Branti,* 445 U.S. at 519, 100 S.Ct. at 1295. That is to say, once we have determined that the bureau for which plaintiff worked "handled matters potentially subject to partisan political differences," *Mendez–Palou,* 813 F.2d at 1258, we must then concentrate our attention upon whether, and if so how, "the plaintiff's position influenced the resolution of such matters." *Id.* We turn, therefore, to that facet of the inquiry.

Goyco de Maldonado served as first vice president (sometimes termed executive vice president for finance) of the Housing Bank.[1] We attach as an Appendix the descriptive OP–16 classification questionnaire prepared by the Puerto Rico Central Office of Personnel. The parties have stipulated to the accuracy of this recital of the position's scope. We note at the outset that the office has considerable responsibility for directing the implementation of a range of important policies—a not-inconsequential consideration. *See Bonilla v. Nazario,* 843 F.2d 34, 37 (1st Cir.1988).

As a basis for denying qualified immunity to Rivera, appellee leans heavily upon our decision in *De Choudens v. Government Development Bank,* 801 F.2d 5 (1st Cir.1986) (en banc), *cert. denied,* —— U.S. ——, 107 S.Ct. 1886, 95 L.Ed.2d 494 (1987), a case involving the position of senior vice president (finance) of the Puerto Rico Government Development Bank. In that case, the plaintiff claimed to have been ousted from government employment in violation of the *Elrod–Branti* standard. The district court, finding that political affiliation was not an appropriate requirement for deChoudens's job, issued a preliminary injunction reinstating her. On appeal, we affirmed the granting of the injunction,

> ... because, although the position at issue involves policymaking, the reposing of confidence, and communicating, we presently conclude that such functions are so remote from advancing or thwarting the agency's partisan-responsive goals that political affiliation would not be considered an appropriate requirement.

*De Choudens,* 801 F.2d at 6.

Appellee assures us that the two posts were fair congeners, and that the suggested comparison appropriately matches apples with apples. The district court was convinced. Although *De Choudens* involved a different agency and a different position, it evaluated the situations as "equivalent." *Goyco de Maldonado,* 671 F.Supp. at 102. But the parallel, as we see it, is far from exact. The compendium of responsibilities attached to plaintiff's office seems to manifest a nexus which we found lacking in *De Choudens,* that is, a "relationship between [the] position and those strategy decisions that the leadership of the Bank might make in response to a new governor's administration in Puerto Rico." *De Choudens,* 801 F.2d at 9. Plaintiff is the person, for example, who (1) advises the president of the Housing Bank on a plethora of issues and who serves as his official representative both in Puerto Rico and abroad; (2) drafts legislation and testifies before the legislature in connection with such bills; (3) represents the bank before administrative agencies; (4) presides over the managerial committee when labor negotiations are in prospect; and (5) exercises substantial control in the personnel area. *See* Appendix. These duties, we think, go beyond those discussed in the *De*

---

**1.** The position was classified as a noncareer or "trust" berth (*"de confianza"*) under P.R.Laws Ann. tit. 3, §§ 1349–51 (1978). This circumstance, of course, "is not controlling for purposes of deciding whether a position constitutionally permits discharge for political reasons, [but] it is one factor which may be considered along with a number of others." *Rodriguez v. Munoz,* 808 F.2d 138, 140 n. 3 (1st Cir.1986). *See also Jimenez Fuentes,* 807 F.2d at 246.

*Choudens* case. *Cf. Nunez*, 834 F.2d at 22–23 (distinguishing *De Choudens* vis-a-vis auxiliary director, fiscal resources of Health Facilities and Services Administration).

## III

We need not probe the comparison too deeply, however, because *De Choudens* is distinguishable in ways more basic than the differences in the jobs involved. In the first place, because *De Choudens* was heard on an appeal from the issuance of an interim injunction, our decision did not signify that politics was unrelated to the position *as a matter of law*. Rather, our conclusions were but "statements as to probable outcomes." *Jimenez Fuentes*, 807 F.2d at 238; *De Choudens*, 801 F.2d at 7. In holding that the district court did not abuse its discretion in granting a preliminary injunction, we took pains to reserve the ultimate issue:

> It may well be that in any further proceedings on a permanent injunction a sufficient nexus will be drawn between the position at issue and the kind of policy relating to partisan concerns.

*De Choudens*, 801 F.2d at 10.

There is a second, more fundamental, distinction as well. *De Choudens* did not deal *at all* with the central issue presented by this appeal: qualified immunity. On the merits, it is necessary for a court to decide whether or not a given position falls outside the sphere of *Elrod–Branti* protection because, say, it "relates to partisan political interests or concerns and ... is a policy-making one." *Roman Melendez v. Inclan*, 826 F.2d 130, 135 (1st Cir.1987). On preliminary injunction, a court stops one step short. As we have just observed, it need go no further than to decide the "probable outcome" of precisely the same inquiry, that is, to make an informed (but nonbinding) prophecy as to plaintiff's "likelihood of success" at an ensuing trial on the merits. *See Collazo Rivera*, 812 F.2d at 259; *Jimenez Fuentes*, 807 F.2d at 238. The qualified immunity inquiry requires that we retreat still another pace. As we recently explained:

> Where ... the issue is qualified immunity, the bottom line query is not whether a particular public employee falls within or without the *Elrod–Branti* realm, but whether, at the time the adverse employment decision was undertaken, "it was clearly established that employees in the *particular positions* at issue, in light of the responsibilities inherent in those positions, were protected from patronage dismissal." In examining this question, we focus not on what the defendants may or may not have known, but on the legal reasonableness of their actions, viewed objectively. That is to say, for appellee to wrest the mantle of qualified immunity from his superiors' shoulders, the contours of his right to keep his job separate from his politics must have been sufficiently plain, on the date of the discharge, that reasonable officials in appellants' shoes would have understood that cashiering [the worker] violated that right.

*Fontane–Rexach*, slip op. 10–11 (citations omitted). Because *De Choudens* did not presume to attempt that analysis, it does not control this case, notwithstanding whatever degree of similarity or equivalency the contested positions may possess.

## IV

█ Against this mise-en-scene, we consider whether or not, in February 1985, plaintiff's right to hold her job free of a politically-inspired strike was "clearly established." In *Juarbe–Angueria*, we observed that "defendants will normally enjoy qualified immunity from damage liability in upper level managerial-type job dismissal cases, cases where the jobs in question are not purely technical or scientific in nature." 831 F.2d at 14. In the present instance, the first vice presidency of the Housing Bank is indisputably an "upper level managerial-type" job. Though there is admittedly a parallel to *De Choudens*—the job does require obvious technical and professional skills—it seems to us to involve at least the necessary "modicum" of "policymaking responsibility" on subjects "that could involve political issues." *See*

*Juarbe–Angueira,* 831 F.2d at 15; *Mendez–Palou,* 813 F.2d at 1259.

At the expense of possible redundancy, we explain briefly. The position in question is attached to the office of the president of the Housing Bank, and the occupant represents the president in a bevy of important functions (especially in the loan, personnel, and labor relations areas). She is also one of his key advisors. The position is one of some (not inconsiderable) influence within the Housing Bank. The duties include directing, planning, and supervising numerous operational and administrative activities of the bank. They are of broad scope and defined in only general terms, thus indicating that policymaking is involved. *Elrod,* 427 U.S. at 368, 96 S.Ct. at 2687. Elements such as relative pay (high), power to control others (substantial), authority to speak on the bank's behalf (clearly present), and opportunities meaningfully to shape implementation of critical policies (plentiful), augur the same. Many of the duties of the position involve setting priorities and engaging in other inputs, such as advocacy, regarding matters and in areas where room for principled policy-oriented debate abounds.

Before proceeding further, we acknowledge that this record reveals a unique feature differentiating plaintiff's case from other reported reprisal firing cases. In January 1977, the Housing Bank formally promulgated a detailed managerial personnel regulation (Regulation).[2] It became a part of the Bank's administrative manual, was disseminated to all managerial employees, and has never to our knowledge been annulled. In sections which arguably apply to the first vice presidency—indeed, which appear on their face to apply agency-wide, without limitation—it is expressly stipulated that "no capable citizen's right to chose [*sic*] a public job will be limited [other than by talent and effort]," *id.* at Art. IIA, and that discrimination in the Housing Bank's employment practices "can never be exercised for race, color, religion, *political beliefs,* sex, origin, birth, social condition or age." *Id.* at Art. IIB (emphasis supplied).

On reflection, we do not think this circumstance to be a particularly decisive one in terms of our present inquiry. The sole claim which is before us is plaintiff's first amendment claim. She has not attempted to predicate her cause of action on the Regulation itself, or on the premise that its breach created a cognizable claim under section 1983. Thus, the Regulation is not determinative of the question of qualified immunity.

The touchstone, we believe, is *Davis v. Scherer,* 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984), where the Court held that a state official's violation of a state statute or regulation, not itself the basis of the federal suit, should not deprive the official of qualified immunity from damages for violation of *other* statutory or constitutional provisions. *Id.* at 193–96, 104 S.Ct. at 3018–20. As the Court stated: "officials sued for constitutional violations do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision." *Id.* at 194, 104 S.Ct. at 3019 (footnote omitted). Put another way, state officials do not "lose their immunity by violating the clear command of a statute or regulation ... unless that statute or regulation provides the basis for the cause of action sued upon." *Id.* at 194, n. 12, 104 S.Ct. at 3019 n. 12.

---

**2.** There is some legitimate question as to whether the existence of the Regulation was adequately raised below. We assume *arguendo* that it was (although in fairness to the district court, its significance may have been blurred by the rather offhand manner of its presentment by plaintiff). Although we acknowledge that state law may well bear upon a due process claim which implicates property interests allegedly created by state law, *see Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33

L.Ed.2d 548 (1972), we express no opinion as to the effect of the Regulation on appellee's claim that she had a constitutionally recognizable property interest in her continued employment. Indeed, the limited scope of our present intermediate review, *see supra* at 684, precludes us from doing so. The district court may, of course, reconsider that question in light of the implications of the Regulation if it elects to do so.

Viewed in this light, the Regulation is of no more weight than, say, decisions of the Puerto Rico courts or job classification labels enacted by the legislature—matters which, in this context, we have consistently treated as nondispositive. *See supra* note 1; *see also Fontane–Rexach,* slip op. at 6 n. 3 (legislature's classification system not determinative of *Elrod–Branti* question); *id.* at 12–13 n. 4 (decisions of commonwealth's courts "not controlling as to the qualified immunity question"). The question—and the *only* question properly presented by an appeal of this genre—"is whether defendant should have reasonably known when he discharged [the worker] that the *federal* law was clearly established against his action." *Rodriguez,* 808 F.2d at 142 (emphasis in original). If "a state actor should have known, when he dismissed an underling, that clearly established *federal* law contravened his actions," *Fontane–Rexach,* slip op. at 12–13 n. 4 (emphasis in original), then he may be liable; otherwise, qualified immunity shields that conduct. Whatever weight the Regulation may have in this calculus, it is insufficient to tip the scales.

Our dissenting brother would treat the Regulation as "a clear expression by the employer that party affiliation is not a valid job requirement," and thus controlling. *Post* at 691. We do not think this can be so. If the employer could determine, absolutely and in all events, whether political loyalty is an appropriate qualification for a given position by the relatively simple expedient of passing a rule or enacting a by-law, then *Elrod–Branti* would soon fade into oblivion. It is the Constitution which, in the last analysis, must tell the tale.

We recapitulate briefly. The first vice presidency seems, on balance, a fairly typical top echelon slot, calling for the exercise of rather wide discretion in an agency which provides vital social services and directly impacts partisan-responsive concerns.[3] The job partakes of policymaking responsibility, engages the holder in an ongoing dialogue with the Housing Bank's president relative to policy concerns, requires her to translate the policies into real-world terms, and necessitates that she act as a spokesperson in communicating such matters to many workers and to the public. *De Choudens* notwithstanding,[4] we think it likely that the first vice presidency of the Housing Bank is an office for which political affiliation may appropriately be considered. *Compare, e.g., Nunez,* 834 F.2d at 22–23 (qualified immunity applies to politically-inspired discharge of auxiliary director, fiscal resources of Health Facilities and Services Administration); *Rosado v. Zayas,* 813 F.2d 1263, 1266 (1st Cir.1987) (same; statistics director for Planning Board); *Mendez–Palou,* 813 F.2d at 1260–61 (same; director of administration, Environmental Quality Board).

We need not be more definite, for even if we concede that *De Choudens* makes the question close, appellant need show no more than that very fact to prevail on his qualified immunity defense. *See Vazquez Rios v. Hernandez Colon,* 819 F.2d 319, 328 (1st Cir.1987) (where applicability of *Elrod–Branti* "not free from doubt, the very uncertainty ... helps to dictate the answer [to the qualified immunity question]: ... the closeness of the call suggests

---

**3.** To be sure, we recently pointed out, and today reiterate, that even some upper level managerial-type government positions might not be "suitable grist for the political mill." *Fontane–Rexach,* slip op. at 15. But *Fontane–Rexach,* which involved a fifth echelon career civil servant's posting as assistant supply chief of the Puerto Rico Electric Power Authority, is a far cry from the case at bar. Goyco de Maldonado's job, unlike Fontane–Rexach's, is not "remote from [the] inner circle" of her agency's strategic leadership posts. *Id.,* slip op. at 5.

**4.** In any event, the timing of events debars plaintiff from urging, credibly, that *De Choud-*

*ens* itself was the shining beacon which should clearly have illuminated Rivera's path. Appellant discharged Goyco de Maldonado well before the *De Choudens* litigation began, and a full eighteen months before our opinion en banc was released. *De Choudens,* as such, is irrelevant to the question of whether Rivera was objectively reasonable in thinking, *when he showed plaintiff the door,* that he could constitutionally do so. *See Vazquez Rios v. Hernandez Colon,* 819 F.2d 319, 326 n. 6 (1st Cir.1987); *Rodriguez,* 808 F.2d at 142.

that it could not have been 'clearly established,' when [the employee] was cashiered, that political affiliation was an improper criterion" for the position).

For these reasons, we conclude that Goyco de Maldonado, in February 1985, was not protected from patronage dismissal by any well established constitutional right.

## V

We need go no further. The district court erred in failing to grant appellant's motion for partial summary judgment. Because Rivera enjoyed qualified immunity, he cannot be held liable in damages to plaintiff. Whether politics is shown at trial to be an appropriate or inappropriate criterion for the Housing Bank's first vice presidency—a question which, for the time being, remains open to further challenge—inappropriateness was not clearly established at the time defendant acted.

*The order denying partial summary judgment is reversed and the cause remanded for further proceedings consonant with this opinion.*

## APPENDIX

Commonwealth of Puerto Rico
PERSONNEL OFFICE
San Juan, Puerto Rico
CLASSIFICATION QUESTIONNAIRE

1. Department:
   HOUSING BANK OF PUERTO RICO
2.1 Bureau, division and section
   Office of the President
3. Place of work
   606 Barbosa Ave.,
   Hato Rey, Puerto Rico
4. 1st last name      2nd      Name
   Goyco      de Maldonado,   Mildred
5. Official title of position
   First Vice President
5a. Position No.
   24 GC
6. Functional title of position
   First Vice President

7. Detail the work that you do in the order of importance of your different duties starting with the most important.

## DUTIES OF THE POSITION

Advise the Bank President on those laws that apply to the Agency, in the administrative phase as those related to loans, mortgage insurance, administration of personnel and labor relations.

Belong with vote and voice to the Bank's Loan Committee.

Draft bills related to the programs developed by the Housing Bank and if necessary, attend the Legislature of Puerto Rico to depose on them.

Represent the Bank before any administrative body to which the President has been summoned representing him and appointed by him.

Represent the President of the Bank in official acts or of private enterprises, held in Puerto Rico or outside of Puerto Rico.

Is responsible for the operations of the Housing Bank, specially directs the Loan Area, Subsidy and Mortgage Insurance.

Preside the Managerial Committee in the negotiation of the Collective Bargaining Agreement.

Advise the President of the Bank as to the scope and nature of the clauses that the Labor Union demands and offer alternatives to substitute those that the Bank cannot accept.

Is responsible for all the documents related to the Labor Union and establishes systems for their conservation and safety.

Examine reports and documents that the area directors and supervisors submit on labor problems and their recommendations.

Represent the Housing Bank at the Labor Relations Board in the conciliation and arbitration hearings.

Is responsible for the arbitration award be complied with definitely by the corresponding party.

In cases of apparent disciplinary problems, preside the administrative hearings that the case requires in order for the employee to present evidence as to why disciplinary measures should not be taken against him.

Hold meetings with those interested in the problem to establish reasonable agreements.

Participate together with the Personnel Office of the Bank in the planning, development and evaluation of the Capability Program in Labor Relations for the managerial personnel and any plan concerning the administration of personnel.

Draft, dsicuss and execute the agreements, through stipulations between the Bank and the Labor Union.

Draft the reports required by the Bank's President.

Do other duties assigned by the President of the Bank or which is required of the position and to which, to his best judgment entails a moral and public obligation.

CERTIFY that this is
a true and correct
translation from its
original
/s/ Mayra Lopez Zambrana
Mayra Lopez Zambrana
US Courts Certified
Translator

TORRUELLA, Circuit Judge (dissenting).

With due respect I believe the majority's decision is flawed as a matter of law. This error is in part the result of the obfuscation wrought onto the field of political discrimination actions by the unremitting line of decisions issued by this circuit which refuse to follow the plain mandates of the Supreme Court in *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980) and *Mitchell v. Forsyth*, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985).

I will not reiterate what I have previously stated[5] regarding this court's fallacious application of the standard for determining whether the applicable law was clearly established at the time of the official action.

*Compare Mitchell v. Forsyth*, 472 U.S. 511, 105 S.Ct. 2806, 2816, 86 L.Ed.2d 411 (1985) ("All [the appellate court] need determine is a *question of law:* whether the *legal* norms allegedly violated by defendant were clearly established....") (emphasis supplied), *with Méndez–Palou v. Rohena–Betancourt*, 813 F.2d 1255, 1259 (1st Cir.1987) (whether "it was clearly established that employees in the *particular position* at issue, in light of the responsibilities inherent in those positions, were protected from patronage dismissal") (emphasis in original). *See also Anderson v. Creighton*, —— U.S. ——, 107 S.Ct. 3034, 3038–39, 97 L.Ed.2d 523 (1987) ("This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of preexisting law the unlawfulness must be apparent."). *Cf. Bonitz v. Fair*, 804 F.2d 164 (1st Cir.1986) (a different standard applied than in political discharge cases); *Cortés–Quiñones v. Jiménez–Nettleship*, 842 F.2d 556 (1st Cir.1988) (same).

Nor will I quibble with the majority's snubbing of *De Choudens v. Government Development Bank*, 801 F.2d 5 (1st Cir. 1986) (en banc), *cert. denied,* —— U.S. ——, 107 S.Ct. 1886, 95 L.Ed.2d 494 (1987), which more and more is looking like a waif in the wilderness. Although I concede that the procedural posture of *De Choudens* was not that of the present appeal, its doctrine should have shed some light on the majority's opinion here given that it is factually indistinguishable from this case.

Irrespective of that situation I am compelled to stand fast against my brothers' struthious determination to ignore the relevance of a regulation which specifically eliminates partisan politics as a condition of employment. This action totally overlooks the employer's own answer to the only

5. *See De Abadia v. Izquierdo Mora,* 792 F.2d 1187, 1204–09 (1st Cir.1986) (Torruella, J., dissenting); *Rosado v. Zayas,* 813 F.2d 1263, 1267–73 (1st Cir.1987) (Torruella, J. dissenting); *Rodríguez Rodríguez v. Muñoz Muñoz,* 808 F.2d 138, 149–50 (1st Cir.1986) (Torruella, J., dissent-

ing); *Juarbe–Angueria v. Arias,* 831 F.2d 11, 17–18 (1st Cir.1987) (Torruella, J., dissenting); *Raffucci Alvarado v. Zayas,* 816 F.2d 818, 822–23 (1st Cir.1987) (Torruella, J., dissenting); *Quintana v. Anselmi,* 817 F.2d 891, 893–94 (1st Cir.1987) (Torruella, J., dissenting).

relevant issue in political firing cases: whether political membership is "an appropriate requirement for the effective performance of the public office involved." *See Branti,* 445 U.S. at 518, 100 S.Ct. at 1295.

Following established technique in these cases,[6] the majority looks to the OP–16 (the job description) to determine the duties of the appellee for the purpose of establishing whether political affiliation is an appropriate requirement of the position. This, of course, is proper. Note, however, that this method of analysis is applied as a means of determining whether party affiliation is a proper standard on which to base employment decisions. In this case, such an analysis is superfluous: the employer's own regulation states that party affiliation is not a requirement for any position at the agency. This analysis is not as the majority suggests, based on finding a constitutional violation through a transgression of state law. *See ante* at 687–688. Rather, in this case, the regulation merely provides a clear expression by the employer that party affiliation is not a valid job requirement.[7] In essence, *the regulation represents a statement by the employer that political considerations are not to be an element in decision making within the agency.* The effect of the regulation and its obvious intent, therefore, is to implicitly include in the OP–16 job description a mandate that the employee, while carrying out his or her duties, is to make no decisions on the basis of party politics.

The fact that the prohibition is contained in a separate document than the OP–16 makes it no less binding on this court for the purpose of determining whether party membership is "an appropriate requirement for the effective performance of the public office involved." In finding that the employer could in good faith use political affiliation as a basis for an employment decision, the court is promoting the violation of this regulation. By ignoring that regulation, we are in effect *federalizing* a discriminatory practice that the employer has specifically eliminated. *This* court has *added* party membership as an "appropriate" requirement for effective performance of the office, a condition which the entity best familiar with the needs of the job, the State, has excluded as *in* appropriate. This court lacks the authority to make party membership an "appropriate" requirement for holding this position against the express wishes of the State, the employer.

Because the anti-discriminatory regulation was in effect since 1977, long before appellant's actions took place, even accepting the erroneous *Méndez Palou* standard for determination of whether the legal norm was clearly established, appellant should be denied qualified immunity. In *Branti* in 1980 the Court affirmed the lower court in striking down the patronage discharge of public defenders. In 1985 when Goyco de Maldonado was discharged as a result of political patronage, the "unlawfulness [of this action] must [have been] apparent." *Anderson v. Creighton,* 107 S.Ct. at 3039.

For the above reasons I dissent.

---

6. *See Jiménez Fuentes v. Torres Gaztambide,* 807 F.2d 236, 244 (1st Cir.1986).

7. Art. XXX of the same regulation makes it even clearer that the employer intended to insulate these employees from personnel decisions based on party politics. It provides that *no* employment decisions are to be made in the period of time from two months before to two months after a general election. Its concern obviously is that during such a heated moment in politics, partisan concerns will slip into employment decisionmaking.