**Zaida Lydia De CHOUDENS, et al.,
Plaintiffs, Appellees,**

v.

**The GOVERNMENT DEVELOPMENT BANK OF PUERTO RICO, et al.,
Defendants, Appellants.**

No. 86–1059.

United States Court of Appeals,
First Circuit.

Sept. 19, 1986.

As Amended Sept. 24, 1986.

Jose Angel Rey, Santurce, Puerto Rico, for defendants, appellants, with whom Saldana, Rey, Moran & Alvarado, Hon. Hector Rivera Cruz, Secretary of Justice, and Rafael Ortiz Carrion, Sol. Gen., were on brief.

Harvey B. Nachman, Santurce, Puerto Rico, for plaintiffs, appellees, with whom Law Offices of Nachman & Fernandez-Sein was on brief.

Before CAMPBELL, Chief Judge, COFFIN, BOWNES, BREYER and TORRUELLA, Circuit Judges.

COFFIN, Circuit Judge.

Plaintiff-appellee Zaida Lydia De Choudens claims she was demoted from her government position on the basis of her political affiliation in violation of her first amendment rights. *See Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980); *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). In this companion case to *Jimenez Fuentes v. Torres Gaztambide,* 803 F.2d 1 (1st Cir. 1986), we decide whether political affiliation was an appropriate requirement for plaintiff's position.

In both cases, federal district judges in the District of Puerto Rico had granted preliminary injunctions, requiring the reinstatement of the plaintiffs to their governmental positions.[1] The plaintiffs, members of the Partido Nuevo Progresista (PNP), had been removed from their positions by officials from the Partido Popular Democratico (PPD), which won the November 1985 general election. In *Jimenez Fuentes,* we reversed the issuance of an injunction, concluding that the position at issue (regional director of a housing agency) resembled one where, because it involved policymaking, confidential, and spokesperson functions in an area responsive to a party's governmental goals, political affiliation was an appropriate requirement. In this case, we affirm the district court's grant of a preliminary injunction because, although the position at issue involves policymaking, the reposing of confidence, and communicating, we presently conclude that such functions are so remote from advancing or thwarting the agency's partisan-responsive goals that political affiliation would not be considered an appropriate requirement.

I.

Plaintiff served in the Puerto Rico Government Development Bank (Bank) for over twenty years. She rose from the position of accountant through eight career-level positions to Senior Vice President of the Finance Area. She was one of the three vice presidents, serving under the President and Executive Vice President. After the new administration assumed power in January 1985, defendant-appellant Jose Ramon Oyola[2] was appointed president of the Bank. In April 1985, Oyola notified plaintiff that she was being "separated" from her position of trust and reinstated to a career position.

II.

Defendants claim that the district court abused its discretion in finding that plaintiff had shown a likelihood of success on the merits. Although they do not concede that plaintiff was transferred for political reasons, they do not challenge that finding. They do challenge the district court's findings that the plaintiff would not have been transferred but for her political affiliation, and that her position was not one for which

---

1. After the court voted to vacate the original panel decision in *Jimenez Fuentes* and hear that case en banc, we voted to hear argument in this case en banc at the same session, without the assistance of a panel decision.

2. The other defendants-appellants are the Bank and its seven directors.

political affiliation was appropriate. We address these asserted errors in turn.

As in *Jimenez Fuentes,* we preface our discussion by noting that our standard of review is whether the issuance of the injunction constituted an abuse of discretion, *id.* at 3, and that our conclusions at this juncture are to be understood as statements as to probable outcomes, *id.* at 4.

### A.

■ The first issue is whether the district court abused its discretion in ruling, pursuant to *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1974), that defendants failed to show that they would have demoted plaintiff notwithstanding her political affiliation. *See Rosaly v. Ignacio,* 593 F.2d 145, 149 (1st Cir.1979). Defendants on appeal face an uphill task because their sole witness was Oyola, the new PPD president of the Bank. Although they introduced much documentary evidence, their *Mt. Healthy* defense rested upon Oyola's credibility.

Oyola stated that he demoted plaintiff because he deemed her incompetent, providing four reasons for his conclusion. First, she had "very bad" relations with the personnel she supervised, based on comments made by union officials. But Oyola spoke of these comments in conclusory terms, and did not know the eventual outcome of the complaints against her. In fact, the few grievances carried to a conclusion largely, if not completely, vindicated plaintiff and the Bank. A union resolution censoring plaintiff may well have arisen from an institutional position taken by the Bank in its labor negotiations.

A second proffered reason was inadequate internal controls in the food stamp division, which made possible a substantial theft of food stamps by several employees who were later convicted. While some audit reports were critical of various Bank procedures, commendations later followed, and it was plaintiff herself who apparently instituted the lengthy investigation that lead to the apprehension of those responsible. Moreover, the district court might well have been skeptical of this reason in light of the fact that the official (a PPD member) in direct charge of the food stamp operation at the time of the thefts was assigned plaintiff's duties after her removal.

A third ground was plaintiff's alleged delinquence in failing to supply enough accounting personnel to service a high-risk private loan program. But evidence showed that plaintiff recognized the problem and obtained temporary outside help. Oyola's fourth and final reason for demoting plaintiff was that she had failed to put into operation a computerized loan-administration system. Although the needed software had been acquired but was not in use, the court found that employees in a division outside the plaintiff's area had not yet developed the files or technique to use it.

In addition to considering the conflicting evidence and inferences relating to the four proffered reasons for demoting plaintiff, the district court was entitled to take into account the following circumstances. Shortly after Oyola took office, the new Secretary of Justice asked to see all files of employees in positions of confidence, including plaintiff's.[3] Subsequently, the Secretary reported his belief that all were indeed positions of confidence, removable at will. Notwithstanding this report, Oyola stated that he removed the three Senior Vice Presidents because of their incompetence. He professed not to know that they were PNP members. Moreover, at no time during the two months preceding plaintiff's demotion did Oyola talk with her or her supervisors about her work or its shortcomings.

In short, we cannot fault the court for finding Oyola not credible. And the various documents are not so clear and compelling as independently to make the case against plaintiff. We therefore find that the district court did not abuse its discre-

---

**3.** Plaintiff's position was a confidential position under the Puerto Rico Public Service Personnel Act of 1975, 3 L.P.R.A. § 1301 et seq. (1978). *See Jimenez Fuentes,* 10.

tion in finding that plaintiff would not have been demoted "but for" her political affiliation.

### B.

Defendants' remaining basis for prevailing on this appeal is their argument that the district court abused its discretion in holding that defendants failed to meet their burden, under *Elrod* and *Branti*, of showing that political affiliation is an appropriate requirement for the position at issue. Rather than recite again our observations as to the relevant authorities and our resulting guidelines of analysis, we rely on our opinion in the companion case, *Jimenez Fuentes*. We do find, however, one proposition worth repeating:

> "A threshold inquiry, which derives from *Branti v. Finkle*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), involves examing whether the position at issue, no matter how policy-influencing or confidential it may be, relates to 'partisan political interests.... [or] concerns.' 445 U.S. at 519, 100 S.Ct. at 1295. That is, does the position involve government decisionmaking on issues where there is room for political disagreement on goals or their implementation. Otherwise stated, do party goals or programs affect the direction, pace, or quality of governance."

*Jimenez Fuentes*, 803 F.2d at 6.

We begin by scrutinizing the Bank itself. Although the district court focused primarily on plaintiff's position in the Bank, it did note the Bank's role as advisor and fiscal agent of the government of Puerto Rico. The court commented on the Bank's need for continuity of organization (fostered by the directors' staggered four-year terms), as well as its need for financial stability and strength. It stated that "to subject this financial institution to the influence peddling and cronyism that patronage brings will erode its very foundation." This was dictum, unnecessary to the court's determination that political affiliation was an inappropriate requirement for plaintiff's position, and we think probably overbroad as applied to the other, more politically-sensitive positions at the Bank.

As of 1984, the Bank had nearly four billion dollars of assets, and some three hundred employees. Its three primary functions are: fiscal agent and financial advisor to the Commonwealth and its Governor, its agencies, municipalities, and public corporations; lender to government and private industry; and depository of Commonwealth funds. The Bank's Annual Report spoke of its "Group," including its subsidiaries and affiliates, as providing "leadership in promoting renewed economic growth"; a "multifaceted, yet coordinated approach to development, which, during fiscal 1984, emphasized commercial, industrial, agroindustrial, tourism, and human resource development"; increased allocations of loans to encourage new investment in hotels, to spur agricultural exports and manufacturing; and a redirection of the Puerto Rico Development Fund to serve small business. Oyola, representing the new administration, testified that he had been given "a clear policy direction ... to create a Development Bank out of the [Bank]" to engage in innovative private financing of each and every organization of the Commonwealth of Puerto Rico.

To us, these seem like indicia of legitimate partisan goals for government operations, not far removed from some of the policy objectives of CRUV discussed in *Jimenez Fuentes*. This, however, need not detain us long for there remains the critical inquiry: even assuming that the Bank's strategic leadership positions are ones for which political affiliation is an appropriate requirement, is plaintiff's position within this group? Defendants, of course, most emphatically endorse the concept of the Bank as an instrument of public policy responsive to a new administration's economic development goals and underscore the district court's statement that it had "no quarrel with [defendants'] contention that [plaintiff] is a policymaker and has access to confidential information within the bank." This, to defendants, is the end of the quest.

So it was in *Jimenez Fuentes* where plaintiffs, regional directors of a public

housing corporation, were top "line officers" or proconsuls for their agency within their region, representing the agency in all respects. Each region was a microcosm of the larger agency, and the duties of each regional director were representative of the duties of the agency's executive director. The instant case, however, presents us with a staff official who, while indubitably in a policymaking, confidential, and communicative position, is both empowered and constrained by the limits of her specialized functions. Because her division is not a microcosm of the larger agency, it is insufficient to show that she is a policymaker for a Bank that involves partisan political concerns. *Elrod* and *Branti* require us to examine whether political affiliation is an appropriate requirement for plaintiff's particular position.

We now paraphrase the district court's findings, which we find amply supported, regarding the plaintiff's position. Plaintiff heads one of the Bank's three main operation areas, the Finance Area, the other two divisions being the Investment, Treasury and Public Financing Area and the Private Financing Area. The Finance Area's main function is the offering of accounting services to the Bank's other areas and dependencies. It keeps accounting records on the Bank's operations and services other government agencies' accounts with the Bank. It also acts as advisor to government agencies on accounting matters.

Within the Finance Area are: the Controller Division, which maintains and updates the Bank's internal systems and procedures to ensure that there are adequate internal controls acceptable to outside examiners; the Budgeting and Control Division, which examines the Bank's proposed disbursements to ensure that they are made in accordance with the approving authority; the Fiduciary Unit, which monitors the payment of the central government of Puerto Rico's public debt and maintains accounting records for the central government's sinking fund; the Accounting Division, which maintains accounting records of the public and private sector loans and prepares monthly and annual statements;

the Current Accounts Division which is in charge of the Secretary of the Treasury of Puerto Rico's account and the payment of central government checks issued by that department and other agencies; the Government Accounts Service Division, which complements the Currents Account Division in serving all government accounts; and the data processing activities, which include three divisions responsible for all the computerized data services.

As Vice President of the Finance Area, plaintiff was in charge of planning, coordinating, directing, and supervising these divisions. She also was a member of the Bank's Loan Committee and she sometimes acted as interim President. Plaintiff testified that she gave advice to the President and the Board of Directors on financial matters within her area.

Keeping in mind the district court's findings of an admittedly broad range of duties, we have scrutinized defendants' brief and record references for evidence of the relationship between plaintiff's position and those strategy decisions that the leadership of the Bank might make in response to a new governor's administration in Puerto Rico. Defendants cogently point to the broad discretion lodged in the Senior Vice President for the Finance Area, the power to make rules and recommend reorganization, the oversight of accounting policy, a contribution to investment strategy, budget and personnel recommendations, and software advice. While these responsibilities signify a position of substance, of valued policy contributions, recommendations, and advice, they involve politically-neutral, technical, and professional matters. Similarly, though plaintiff was indeed an agency spokesperson, there is no suggestion of any "party line" or political, goal-oriented message that she ever communicated.

What did pique our interest was the power, delegated on occasion, of plaintiff to act as president of the Bank, because this responsibility might overleap the normal technical boundaries of plaintiff's position. Our review of the record reveals only the

following occasions when she acted as president: when the President informed her of the Bank's position; when she made no decision; when she commenced the budget presentation to the Board of Directors because the President was late; when she gave a technical reason to the Board for holding up a loan disbursement;[4] and when she acted only after calling the President for instructions.

In order to carry their burden of demonstrating the politically-sensitive nature of the position at issue, defendants relied on Oyola to identify where and how a person in plaintiff's position might help or hinder the pursuit of the Bank leadership's strategic goals. He stated that the Finance Area was the most important of the Bank's three areas for the "internal work" of the Bank to ensure "the proper flow of work." He added that it was important "to have the same views of what the accounting system should be...." Not only did Oyola admit that he did not know what plaintiff's ideas were on such matters, but it seems clear to us that however broadly "partisan" may be defined, it cannot encompass these technical, professional criteria. And, although defendants allude to plaintiff's part in administering the loan portfolio, Oyola's testimony reveals that plaintiff's involvement consisted of accounting advice.

The district court concluded:

"The area which plaintiff previously directed is precisely that part of the institution entrusted with safeguarding its bank operations in the strict sense of the word. The Finance Area is essentially a provider of accounting services and technical, financial information to give other areas of the Bank the necessary input to make their decisions. Whatever characteristics of plaintiff's former position could arguably be related to a partisan political interest are so insubstantial when considered in the context of her overall functions that they do not outweigh her First Amendment right to political affiliation."

At this juncture, based on the evidence before the district court, we cannot find any abuse of discretion. We recognize the closeness of a case involving the political firing of a top policymaking official in a public agency. It may well be that in any further proceedings on a permanent injunction a sufficient nexus will be drawn between the position at issue and the kind of policy relating to partisan concerns. At the moment, however, we cannot fault the district court for not seeing it.

*The district court's issuance of a preliminary injunction is affirmed.*

TORRUELLA, Circuit Judge (concurring).

Although I agree with the conclusion of this appeal, to the extent that it relies on the reasoning of the *en banc* opinion issued today in *Jiménez Fuentes v. Torres Gatzambide*, 803 F.2d 1 (1st Cir. 1986), I cannot but concur in its outcome. I also am in disagreement with the *en banc* attention given to this case *sans* the normal procedure of panel consideration having been previously accorded. I see nothing in this case which warrants such expedited treatment.

---

**4.** The background of this presentation was that the Board of Directors had passed two or three resolutions regarding the loan in question. Technical difficulties had arisen, and it was not clear that the Board wished to take a second-mortgage position subordinate to a private bank. Plaintiff could not discern the Board's intent from the minutes and "had to go back to the board and ask them." This indicates to us the dominant policymaking status of the Board on approving loans and the purely technical role of plaintiff's position.