<head>

<title>USCA1 Opinion</title>

<style type="text/css" media="screen, projection, print">

<!--

@import url(/css/dflt_styles.css);

-->

</style>

</head>

<body>

                United States Court of Appeals
                    For the First Circuit

No. 97-1076

               KEVIN N. FLYNN AND RANDY WOLFSON,
                                 
                    Plaintiffs, Appellants,

                               v.

                    CITY OF BOSTON, ET AL.,
                                 
                     Defendants, Appellees.
                      ____________________

          APPEAL FROM THE UNITED STATES DISTRICT COURT

               FOR THE DISTRICT OF MASSACHUSETTS

         [Hon. Richard G. Stearns, U.S. District Judge]
                      ____________________

                             Before

                     Boudin, Circuit Judge,

John R. Gibson, Senior Circuit Judge,

and Pollak, Senior District Judge.
                     _____________________

   Mark S. Bourbeau, with whom Liam C. Floyd and Bourbeau &
Bourbeau, Bonilla, Tocchio & Floyd, LLP were on brief for
appellants.
   Mary Jo Harris, with whom Kopelman and Paige, P.C. was on
brief for appellees.

                                
                                
                         May 12, 1998
                                
                                
                                
 BOUDIN, Circuit Judge.  Kevin Flynn and Randy Wolfson
appeal from the district court's grant of summary judgment in favor
  of the defendants in their action alleging that they were
 discharged from their jobs with Boston Community Centers in
violation of the First Amendment.  Their former employer is an
agency of the City of Boston with 400 employees and a budget of $15
million.  It is concerned with the delivery of social services,
including child care, youth work, and senior citizen programs, and
it administers grants both from city funds and from other sources.
       In January 1994, the newly elected mayor of Boston
   appointed Evelyn Riesenberg, formerly one of his special
assistants, as the director of Boston Community Centers.  Kevin
 Flynn was then the associate director of administration and
finance; Randy Wolfson was one of two associate directors for field
operations.  In their later filed court papers, Flynn and Wolfson
   describe Riesenberg's reign in very unflattering terms.
        In particular, they charge that from the outset,
Riesenberg pressed Wolfson to tell her which senior staff members
had worked for particular mayoral candidates; and Flynn says that
Riesenberg asked him how she could fire the entire central office
staff and replace them with her own supporters or those of the
mayor.  Both say that they argued with Riesenberg against this
                      course of action.
        They also say that Riesenberg sought, over their
opposition, to appoint unqualified personnel to reward supporters
of the mayor, and they provide specific examples.  Flynn says that
Riesenberg ordered him to raise pay for a union worker in violation
of the union contract.  Flynn and Wolfson also say that Riesenberg
 mishandled several sexual harassment complaints and related
         personnel actions, despite their objections.
       In August 1994, Riesenberg gave Flynn and Wolfson
 termination notices, asserting that she was reorganizing the
agency.  When they protested, the city's corporation counsel wrote
    to them that they were being discharged because of the
reorganization and "an evaluation of their performance."  Flynn and
Wolfson in turn say that the reorganization was a sham and that
  neither of them has any negative evaluations in his or her
                       personnel files.
    After Flynn and Wolfson were fired, they brought suit in
the district court against Riesenberg, the mayor, and the city.  
 The plaintiffs sought declaratory and injunctive relief, and
damages under 42 U.S.C.  1983, on the ground that their First
Amendment rights had been infringed; they also made statutory and
 common law claims based on state law.  After discovery, the
plaintiffs waived some claims, and the district court dismissed or
granted summary judgment in favor of defendants on all of the
                      remaining claims.
      On summary dispositions, we take the facts and draw
inferences in favor of the non-moving party.  Ortiz-Piero v.
Rivera-Arroyo, 84 F.3d 7, 11 (1st Cir. 1996).  But the question
whether a position is subject to political discharge, or how far
the First Amendment protects against having one's views considered
in adverse personnel actions, are essentially legal questions for
the court, even if they are close questions.  McGurrin Ehrhard v.
          Connolly, 867 F.2d 92, 93 (1st Cir. 1989).
     From the outset of the Republic, government jobs have
gone by political patronage, tempered now by civil service laws
that afford varying degrees of protection, especially to lower
level employees.  See Elrod v. Burns, 427 U.S. 347, 377-79 (1976)
(Powell, J., dissenting).  To this accommodation, the Supreme Court
about 25 years ago brought a new constitutional principle:  that
political firings by the government are allowed only in those jobs
for which political loyalty is an "appropriate" criterion.  SeeElrod v. Burns, 427 U.S. 347, 372-73 (1976); Branti v. Finkel, 445
U.S                    . 507, 518 (1980).
      In response, the lower federal courts have tried to
  develop doctrine, but it is largely a porridge of general
  statements and variables:  positions are less likely to be
protected to the extent that they are "higher," more "political,"
 more "confidential," and so on; duties prevail over titles;  
everything depends on circumstances.  See, e.g., Cordero v. De
Jesus-Mendez, 867 F.2d 1, 10-21 (1st Cir. 1989); see also 4 R.D.
Rotunda & J.E. Nowak, Constitutional Law:  Substance and Procedure 20.42, at 272-75 (2d ed. 1992).  To get any practical sense of
where the lines have been drawn, one has to look at the results.  
See Jimenez Fuentes v. Torres Gaztambide, 807 F.2d 236, 241 (1st
Cir. 1986) (en banc) (collecting cases), cert. denied, 481 U.S.
                         1014 (1987).
    At least in the First Circuit, the cases have regularly
upheld against First Amendment challenge the dismissal on political
grounds of mid- or upper-level officials or employees who are
significantly connected to policy-making.  This result has followed
  where the plaintiff merely represented the agency's policy
positions to other entities or to the public or where important
 personnel functions were part of the portfolio.  See, e.g.,
Cordero, 867 F.2d at 11-12, 14.  The common thread is that the
officials or employees were policymakers or those who are in close
           working relationships with policymakers.
   Thus, we have upheld political discharges of the regional
director of an administrative agency, the municipal secretary in a
mayor's office, an officer in charge of human resources, a director
of public relations, a superintendent of public works, a director
of a city's federal programs office, and a director of a satellite
office of the Massachusetts Secretary of State.  Many such
plaintiffs were subordinates within their own offices.  Just one
decision provisionally protected an official with a high-sounding
title, but her duties were essentially technical.  See De Choudensv. Government Dev. Bank of Puerto Rico, 801 F.2d 5, 9-10 (1st Cir.
1986), cert. denied, 481 U.S. 1013 (1987).  
    By contrast, this court has disallowed political firings
for a cleaning supervisor, a career employee administrative aide,
and an auditor of books and records.  See Cordero, 867 F.2d at 14-
15, 16-18.  The Supreme Court cases, granting or looking toward
protection, have involved a floor supervisor, a guard, a process
server, an assistant public defender, a rehabilitation counselor,
a road equipment operator, a garage worker, and a dietary manager.  
See Elrod, 427 U.S. at 350-51, 372-73; Branti, 445 U.S. at 508,
519-20; Rutan v. Republican Party, 497 U.S. 62, 67, 76 (1990).
Thus, it is primarily low-level jobs that have been protected,
although this encompasses most workers in most agencies of
government.
    "Appropriate"--the test used in Branti--is an elastic
concept, but we have an obligation to apply it consistently within
the circuit.  Under our prior decisions, Flynn is not protected.  
As associate director of administration and finance at Boston
Community Centers, he had authority over human resource issues,
supervision of the grants managers and personnel director, labor
negotiations, and liaison responsibilities with a number of city or
state agencies.  See Cordero, 867 F.2d at 11-15; cf. Goyco, 849
F.2d at 685.  These major responsibilities meant that policy
disagreements with his politically appointed supervisor could lead
to less effective implementation of political goals.
    Wolfson is a closer case, but not by much--given the
standards of prior cases.  She was associate director for field
operations and supervised about half the site coordinators, oversaw
several programs, served as liaison with two city agencies,
oriented new local council members, and monitored compliance with
legal requirements.  Cf. Nunez, 834 F.2d at 24.  Like Flynn,
Wolfson reported directly to the executive director of the agency
and so represented top management in an agency with 400 employees.  
    The responsibilities of Flynn and Wolfson just described
--and these are functions, not titles--obviously implicate policy.  
Indeed, they are the same kind of senior management functions that
our earlier decisions have ascribed to a number of employees found
to be subject to political discharge.  For example, Cordero, 867
F.2d at 13-14, upheld the dismissal of a municipality's director of
finance, whose primary tasks included supervision of the accounting
system, advising officials on fiscal matters, and supervising the
disbursement of municipality funds.  And in McGurrin Ehrhard, 867
F.2d at 93-95, we sustained the dismissal of the director of the
Massachusetts Secretary of State's satellite office, whose job
consisted essentially of providing information to citizens, "input"
into personnel issues, and development of office policies.
    Under our decisions, an employee is not immune from
political firing merely because the employee stands apart from
"partisan" politics, see Mendez-Palou, 813 F.2d at 1262-63, or is
not the ultimate decisionmaker in the agency, see McGurrin Ehrhard,
867 F.2d at 95, or is guided in some of his or her functions by
professional or technical standards, see Cordero, 867 F.2d at 13-
14.  Rather, it is enough that the official be involved in policy,
see Jimenez Fuentes, 803 F.2d at 6, even if only as an adviser,
implementer, or spokesperson, as Flynn and Wolfson certainly were.  
To hold Flynn and Wolfson to be protected would effectively depart
from the main line of case law in this circuit.
    One might ask why anyone, apart from elected officials,
should be subject to "political" firing.  The answer--this is folk
wisdom, not mathematical proof--is that to implement their
mandates, elected officials need a cadre of agency leaders  and top
subordinates responsive to the elected officials' goals.  See,
e.g., Elrod, 427 U.S. at 367.  A rule effectively preventing the
replacement of senior officials by new administrations would be a
very serious step.  A legislature can provide such tenure, but the
Constitution does not command it.
    None of this means that every "political" firing of a
senior official is an act of good government.  Indeed, if the
allegations of the complaint are true, and they are still only
allegations, Flynn and Wolfson were public servants honestly
resisting very dubious behavior by a superior.  But the main remedy
for mismanagement is elections.  And officials who rise to the
level of Flynn and Wolfson do so at the cost of any constitutionaltenure protection against political discharge--unless and until the
Supreme Court takes a different view and extends Elrod and Brantifurther.
    A different, although related, issue is presented by the
plaintiffs' alternative claim that they were fired "in retaliation"
for protected speech.  The legal standard in this area is
notoriously fuzzy because the cases deal under the same head with
very different problems and "justifications," for example, the
disruptive employee, the whistle-blower who ignores channels, the
official who disagrees about policy, the contractor who offers
public political criticism of the agency, and so on.
   In the present case, we are not concerned with public
expressions of political opposition or whistle-blower reports made
publicly or within the agency but outside regular channels.  
Rather, the plaintiffs are policy level officials who disagreed
with their superior on a number of policy and personnel issues
before the agency and (quite properly, based on their allegations)
expressed their disagreement to her.  Although Riesenberg denies
it, we must suppose (on summary judgment) that plaintiffs could
prove at trial that these disagreements contributed to their
firing.   
   To this extent, the plaintiffs' expression of their views
on issues played a role in their loss of position, and we will
assume arguendo that the issues upon which Flynn and Wolfson
expressed disagreement are the types of matters "of political,
social, or other concern to the community" that the Supreme Court
has said would trigger First Amendment analysis.  Connick, 461 U.S.
at 146.  But expressing views on matters of public concern is only
the first step in the Supreme Court's test for whether an employee
is protected by the Constitution from being fired for expressing
views.
   The second step, vital here, is a balancing of the
employee's interests "as a citizen, in commenting upon matters of
public concern" against "the interest of the State, as an employer,
in promoting the efficiency of the public services it performs
through its employees."  Pickering, 391 U.S. at 568.  The Supreme
Court has identified a number of state interests that might be
impaired by an employee's statements (discipline, harmony among co-
workers, interference with duties), but one such interest looms
large here:  the effect of the statements on those close working
relationships for which personal loyalty and confidence are
necessary . . . ."  Rankin v. McPherson, 483 U.S. 378, 388 (1987).
   In Hall v. Ford, 856 F.2d 255 (D.C. Cir. 1988), the
District of Columbia Circuit addressed this type of justification
in a situation somewhat akin to this case.  In Hall, the University
of the District of Columbia's athletic director was fired allegedly
due to a disagreement between him and the university's president
over the university's compliance with its own and NCAA rules.  The
court held initially that the athletic director's statements were
about matters of public concern.  It then moved to the second step,
as we do in this case.   
   Recognizing that the Supreme Court had not yet squarely
addressed the situation in free speech terms, the District of
Columbia Circuit looked to the political patronage cases for help.  
856 F.2d at 261-64.  "Although not directly applicable, the
patronage cases address similar concerns and recognize a government
interest that is apposite here."  Id. at 261.  Ultimately, the
court upheld that the right of the university president to insist
on an athletic director who had compatible views on university
matters, paralleling the political patronage cases.  See alsoDiMeglio v. Haines, 45 F.3d 790, 805-06 (4th Cir. 1995).
   No mechanical formula exists to resolve all cases where
an employee is fired and the firing can be traced back in some
causal way to "speech" by the employee.  But we think it is a
reasonable working rule that, where the employee is subject to
discharge for political reasons under the Elrod and Branti cases,
a superior may also--without offending the First Amendment's free
speech guarantee--consider the official's substantive views on
agency matters in deciding whether to retain the official in a
policy related position.  Indeed, without this congruence, the
latitude allowed to the superior by the Supreme Court could be
effectively nullified.
   The issues about which Flynn and Wolfson spoke--and the
speech to which they attribute their firings--related to the
operation of the office (primarily to matters of hiring, firing and
discipline).  Yet it is issues of this kind, and the views of
management employees about these issues, that are properly
considered by the head of the office in deciding who is best suited
to be her direct subordinates.  Precisely because Flynn and
Wolfson's "speech" did bear on the job and on their working
relationship with Riesenberg, Riesenberg was permitted to conclude
reasonably that she did not have the necessary trust and confidence
to retain them.
   In this context, it does not make any difference that
Flynn and Wolfson may have been "right," and Riesenberg wrong in
the positions urged or taken.  A jury might easily be confused on
this point, thinking that a junior official should be praised and
not fired for giving sound advice.  But staffing the senior levels
of a city agency is the business of the mayor and his appointees,
responsible in turn to the electorate, unless a legislature says
otherwise.
   This does not mean that anything goes for policy-related
positions:  this would be a different case if an executive were
fired for reporting a crime or fraud or for expressing adherence to
one church or another.  Compare O'Connor, 994 F.2d at 915-16.  So,
too, the situation would be different if a clerical worker, in a
non-disruptive and otherwise proper manner, disagreed about how the
agency was doing its job.  If the employee were not at a policy
level, it might be hard to see why such criticism would be
pertinent to retention.
   Further, the lack of a First Amendment claim does not
mean that the plaintiffs are without remedy.  The district court
dismissed plaintiffs' state-law counts for wrongful discharge and
related misconduct, and plaintiffs have appealed.  But absent
federal claims, it is not clear why either this court or the
district court should be drawn into issues that involve the
construction of state statutes and of state common law as applied
to regulate the personnel actions of a local governmental unit.
   The only jurisdiction in the district court over the
state claims was pendent, and the federal claims were dismissed
before trial.  Given the subject matter, there is special reason
why state judges should referee disagreements about whether and
when state or local officials may be fired.  Cf. Pyle v. South
Hadley Sch. Comm., 55 F.3d 20, 22 (1st Cir. 1995).  Where this is
so, and where as here there are few economies in a federal court
resolution, the better course is ordinarily to dismiss the state
claims without prejudice and leave them to local courts.  Cf.Carnegie-Mellon Univ. v. Cahill, 484 U.S. 343, 350 (1988).
   For the foregoing reasons, the district court's grant of
summary judgment in favor of the defendants on the federal claims
is affirmed, the district court's grant of summary judgment in
favor of the defendants on the state-law claims is vacated, and the
case is remanded for dismissal of the state-law claims without
prejudice.  Each side shall bear its own costs on this appeal.
   It is so ordered.

                               Dissent follows.

   JOHN R. GIBSON, Senior Circuit Judge, dissenting.  I
respectfully dissent.  In my view, the court today focuses on job
title and place in the organizational hierarchy to decide whether
a position is subject to a political affiliation requirement.  The
majority measures the distance from Wolfson and Flynn to
Reisenberg, a policymaker, to determine whether their jobs are
political.  Although job title and position are certainly relevant
to decide whether a position is political, the court's inquiry does
not square with the inquiries directed by the Supreme Court in
Branti v. Finkel, 445 U.S. 507, 518 (1980), or this court in
O'Connor v. Steeves, 994 F.2d 905, 910 (1st Cir.), cert. denied,
510 U.S. 1024 (1993), which require a close examination of the
overall functions of the employee's department, as well as the
particular responsibilities of the position.   
   Indeed, we have emphasized that the appropriateness of
making political affiliation a job requirement is not solely
determined by either agency hierarchy or the scope of job duties.  
"Regardless of the position of an employee within the government
hierarchy, or the broad scope of his or her duties, if the employee
is responsible only for duties that are measured solely by strictly
technical or professional criteria, the job is nonpartisan in
nature and not properly a target of patronage dismissal."  Mendez-
Palou v. Rohena-Betancourt, 813 F.2d 1255, 1258 (1st Cir. 1987).   
   The court today avoids the significance of our en banc
decision in De Choudens v. Government Development Bank of Puerto
Rico, 801 F.2d 5 (1st Cir. 1986), cert. denied, 481 U.S. 1013
(1987).  De Choudens, a companion case to Jimenez Fuentes v.
Torres Gaztambide, 807 F.2d 236 (1st Cir. 1986) (en banc), cert.
denied, 481 U.S. 1014 (1987), nonetheless, is controlling.  De
Choudens had been Senior Vice-President of Finance at the Puerto
Rico Government Development Bank, one of three vice presidents
serving under the president and executive vice president.  Id. at
6.  The bank's primary functions were to act as fiscal agent and
financial advisor to the Commonwealth of Puerto Rico, its governor,
and political subdivisions; lender to government and private
industry; and depository of Commonwealth funds.  Id. at 8.  De
Choudens claimed that she was demoted because of her political
affiliation, and we affirmed the district court's order reinstating
her.   
    We held that the bank had "indicia of legitimate partisan
goals for government operations, not far removed from some of the
policy objectives of [the agency] discussed in Jiminez Fuentes."  
Id. at 8.  Unlike Jiminez Fuentes, however, we concluded that De
Chouden's job position did not justify a political affiliation
requirement.  She was a "staff official who, while indubitably in
a policymaking, confidential, and communicative position, is both
empowered and constrained by the limits of her specialized
functions."  Id. at 9.  Unlike the department in Jiminez Fuentes,
"her division [was] not a microcosm of the larger agency."  Id.   
The government emphasized her broad discretion in rule-making,
reorganization, accounting policy, investment strategy, and budget
and personnel recommendations, but we found the need for political
affiliation lacking:   
    While these responsibilities signify a
    position of substance, of valued policy
    contributions, recommendations, and advice,
    they involve politically-neutral, technical,
    and professional matters.  Similarly, though
    plaintiff was indeed an agency spokesperson,
    there is no suggestion of any "party line" or
    political, goal-oriented message that she ever
    communicated.
Id.  (emphasis added).   
    The court today gives only brief consideration to the
tasks required of Flynn and Wolfson.  The court does not focus on
whether Flynn's and Wolfson's duties are "politically-neutral,"
"technical," or "professional," De Choudens, 801 F.2d at 9, or
whether their duties are those of a "policy maker, privy to
confidential information, a communicator, or some other office
holder whose function is such that party affiliation is an equally
appropriate requirement."  O'Connor, 994 F.2d at 910.  Nor does the
court consider factors relevant to this determination such as
"relative pay, technical competence, power to control others,
authority to speak in the name of policy-makers, public perception,
influence on programs, contact with elected officials and
responsiveness to partisan politics and political leaders."  
Jimenez Fuentes, 807 F.2d at 242.   
    Wolfson, as Associate Director for Field Operations, has
described her job as:  
    overseeing the operations at 20 Community
    centers, including recreation, aquatics,
    programming, personnel, and budgets,
    monitoring the various programs of the [Boston
    Community Centers] for compliance with
    municipal, state, and federal regulations,
    providing technical assistance to the non-
    profit corporate arms of the centers, writing
    of the operational and non-profit fiscal
    compliance manuals for the agency, and
    supervision of capital improvements,
    maintenance, and repairs.

The City submitted a written job description for Wolfson's
position.  The description provided that the Associate Director
"shall, under the Director . . . oversee the daily operations of
the Boston Community Schools & Recreation Centers Program."  The
responsibilities included: monitoring, supervising, and assisting
the coordinators; assisting in the governance process as it applies
to the formation of new councils; facilitating referral and support
networks between local operations; providing technical assistance
in the recruitment and hirings of coordinators; and giving
orientation and supervision to coordinators during the initial
ninety days of employment.  
    Viewing the evidence in the light most favorable to
Wolfson, I do not believe that party affiliation is an appropriate
job requirement for her position.  The focus of her
responsibilities was community center operations, and she was
involved in "hands-on," day-to-day operations.  Wolfson was
responsible for operational concerns such as recreational programs,
program personnel and budgeting, maintenance and capital
improvements, and compliance with applicable regulations.  She
testified in her deposition that she oversaw the Boston
Neighborhood Basketball League and supervised the aquatics
directors for the pools.  She explained that she worked with the
advisory board and councils for the community centers, and her role
was to ensure compliance with the plan of operations.  Political
party goals do not play a role in these aspects of operations.  
Rather, her specialized job responsibilities involved "politically-
neutral, technical, and professional matters."  De Choudens, 801
F.2d at 9.  See Cordero v. DeJesus-Mendez, 867 F.2d 1, 14-15 (1st
Cir. 1989).  Although Wolfson had a connection to some policy-
making functions, her specialized functions did not create or
impact any policies of the department.  See De Choudens, 801 F.2d
at 6.  There is no doubt that Wolfson occupied an important
position with the Boston Community Centers, however, there is no
evidence that her position allowed her to make partisan decisions,
nor is there any suggestion that she ever communicated any
political message.  See De Choudens, 801 F.2d at 9.  Cf. Hall v.
Ford, 856 F.2d 255, 265 (D.C. Cir. 1988) ("highly visible
spokesman").  Political affiliation is not an appropriate job
requirement.   
    Similarly, Flynn describes his job responsibilities as
including the:
    oversight of all finance and personnel
    functions within the [Boston Community
    Centers], preparation and implementation of
    the department budget, supervision of state,
    federal, and private grants management,
    management of the agency's payroll and
    contract functions, providing fiscal, legal,
    and personnel assistance to the non-profit
    corporate arms of the centers liaison to the
    city's law department, labor relations, and
    federal agencies.

Flynn's written job description describes Flynn's duties as:
planning and evaluating administrative procedures for the programs;
developing analytical models for use in the evaluations; preparing
statistical reports and working with others to evaluate the data;
and developing procedural guidelines for appropriate staff.  
    I agree that reviewing Flynn's political affiliation
claim is a closer question than Wolfson's because Flynn's position
was more closely involved with policy formulation and confidential
information at the Central Office.  Nevertheless, viewing the
evidence in the light most favorable to Flynn, as we are required
to in the appeal from summary judgment, I believe that his position
did not concern partisan political interests.  Flynn's position
lacked the capabilities of influencing political goals.  His
affidavit states that he "never worked with the Mayor's office to
establish goals and objectives . . . but only to find out what the
goals and objectives were."  Flynn explained in his deposition that
"[t]he largest political policy issues would be dealt with [sic]
the executive director."  Although Flynn was in charge of preparing
the department budget, his deposition clarifies that he prepared
the budget following the directives from the mayor and executive
director.  Flynn's responsibilities seem quite similar to those in
Fontane-Rexach v. Puerto Rico Electric Power Authority, 878 F.2d
1493, 1495, 1500 (1st Cir. 1988), in which we noted that although
the supply officer would not always approach his job in a uniform
way, it was improbable that his decisions would involve partisan
political goals.  Id. at 1496.  Likewise, Flynn's job duties were
largely limited to the technical and specialized aspects of finance
and budgeting, and his duties beyond those areas carried only a
limited potential for influencing political goals.  As in De
Choudens, Flynn was essentially a staff official with specialized
knowledge, and "although his position involved policy-making, the
reposing of confidence, and communicating," such functions were
"remote from advancing or thwarting the agency's partisan-
responsive goals."  See 801 F.2d at 6.  Accordingly, political
affiliation is not an appropriate requirement.   
    I believe that Flynn and Wolfson have presented evidence
sufficient to survive summary judgment on their claim that they
were terminated from their jobs because of their lack of political
affiliation with the Mayor.  Accordingly, I would reverse the
district court's judgment on this issue.
    Because I conclude that Flynn's and Wolfson's positions
are not political positions, I also part company with the court's
view that they have no First Amendment claim.   
    Flynn's and Wolfson's objections to Riesenberg's handling
of certain sexual harassment claims constitute a matter of
legitimate public concern.  The  allegations bear on Riesenberg's
fitness to serve as Executive Director, similar to the public
concern we identified in O'Connor.  See 994 F.2d at 915.  Because
such statements concern a topic which is a matter of inherent
concern to the public, we need not examine plaintiffs' personal
motivations for speaking out.  Id. at 915.  
    I concede that the employees' objections to Riesenberg
about personnel practices present a more difficult circumstance.  
In Connick v. Myers, 461 U.S. 138 (1983), the Court considered a
questionnaire circulated by an assistant district attorney,
inquiring about matters such as the office's transfer policy,
office morale and the level of confidence in supervisors.  Id. at
141.  The Court concluded that this speech related only to internal
office policy and did not touch upon matters of public concern.  
Id. at 154.
    Compared to the speech in Connick, however, the
complaints of Flynn and Wolfson about office policies and
procedures touch upon matters more likely to be of public concern,
i.e., whether the city based personnel decisions on political
alliances without regard to qualifications.  Because this speech
does not necessarily qualify on its face as a matter of public
concern, we must examine its context more fully.  See O'Connor, 994
F.2d at 914.  Unlike the statement in Connick, the statements at
issue were not made after the adverse employment decision, thus
suggesting retaliation, and were not directly related to the
plaintiffs' own employment situation.  See 461 U.S. at 148.  While
this is a close issue, I am convinced that the employees' evidence
is sufficient to survive summary judgment.  Personnel decisions
based on political affiliation are much more than an individual
employee's grievance against his employer.  See Connick, 461 U.S.
at 148.  I do not address the second and third steps of the
O'Connor analysis (balancing of interests and consideration of
motivations for plaintiffs' terminations) because the district
court did not reach those issues.  See 994 F.2d at 912-13.  I would
only hold that the employees have raised a genuine factual issue as
to whether they engaged in speech concerning a matter of public
concern protected by the First Amendment.   
    Finally, I would also allow Flynn and Wolfson to assert
their pendent state law claims for wrongful termination.  The
district court decided that a "whistleblowing" employee may be
entitled to public protection under Massachusetts law.  
Nevertheless, the court granted summary judgment in the city's
favor on the wrongful termination claim because of its ruling that
the employees' speech criticizing Riesenberg's decision did not
constitute whistleblowing.  I have reached a contrary conclusion as
to the public nature of the speech in question and, therefore, I
would conclude that there is a genuine issue of material fact as to
whether the speech at issue falls within the public policy
exception.  See GTE Products Corp. v. Stewart, 653 N.E.2d 161, 164-
65 (Mass. 1995).   
    I would reverse the district court's judgment.

</body>

</html>