**EnergyNorth v. AEGIS**        **CV-95-591-PB   07/01/99**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**

**EnergyNorth Natural Gas, Inc.**

    v.                         Civil No. C-95-591-B

**Associated Electric & Gas
Insurance Services, Ltd., et al.**

**MEMORANDUM AND ORDER**

EnergyNorth Natural Gas, Inc., has sued its insurers pursuant to 28 U.S.C.A. § 2201 and N.H. Rev. Stat. Ann. § 491:22, seeking indemnification for costs it incurred in investigating and restoring a Concord, New Hampshire, site polluted by its predecessors' coal gas manufacturing operations. Defendant American Home Assurance Co. has moved for summary judgment arguing that its policies do not cover the disputed costs because the pollution at the site developed gradually. For the reasons set forth below, I grant American Home's motion.

**I.**

EnergyNorth is the successor-in-interest to several companies that until 1957 manufactured coal gas at a plant in Concord, New Hampshire. American Home provided Comprehensive

Excess Liability ("CEL") coverage to EnergyNorth from July 30, 1980, until June 1, 1982, and from June 1, 1984, until June 1, 1985.

The American Home policies cover property damage "caused by or growing out of each occurrence . . . [which term] shall mean one happening or series of happenings, arising out of or due to one event taking place during the term of this contract." The parties dispute whether coverage can be triggered under this definition of occurrence by continuous, gradual injury to property during the policy period. The dispute centers on the meaning of the term "event," which EnergyNorth defines to mean simply an "unintentional act." American Home, on the other hand, argues that the term means a sudden, discrete happening which takes place during the policy period. If American Home's interpretation is correct, it is not liable for EnergyNorth's cleanup costs because the pollution at the site developed gradually.

I held in a prior order that the American Home policies are ambiguous and reasonably could be understood to include coverage for gradually incurred property damage. See EnergyNorth Natural Gas, Inc. v. Associated Electric & Gas Insurance Services, Ltd., et al., CV-95-951-B (D.N.H. Sept. 30, 1998)(Memorandum and

Order)(denying without prejudice both EnergyNorth's and American Home's motions for summary judgment). Because New Hampshire law requires that ambiguities in an insurance contract must be resolved in favor of the insured, this ruling ordinarily would result in a decision in EnergyNorth's favor. See High County Assoc., 139 N.H. at 41. Here, however, American Home argues that New Hampshire's normal policy construction rules do not apply because the definition of occurrence used in the policies was selected by EnergyNorth's agent rather than the insurance company. It also contends that its proposed interpretation is the only plausible construction of the policies when they are construed in light of the relevant extrinsic evidence. EnergyNorth challenges both contentions and also moves to strike certain deposition excerpts that American Home cites in support of its position.

## II.

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P.

56(c); see Lehman v. Prudential Ins. Co. of Am., 74 F.3d 323, 327 (1st Cir. 1996). A genuine issue is one "that properly can be resolved only by a finder of fact because [it] . . . may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). A material fact is one that affects the outcome of the suit. See id. at 248. In ruling on a motion for summary judgment, I must construe the evidence in the light most favorable to the non-movant and determine whether the moving party is entitled to judgment as a matter of law. See Oliver v. Digital Equip. Corp., 846 F.2d 103, 105 (1st Cir. 1988).

American Home bears the burden of proving that EnergyNorth is not covered by the policies it issued to its insured. See EnergyNorth Natural Gas, Inc. v. Associated Electric & Gas Insurance Services, Ltd., et al., CV-95-591-B (D.N.H. September 30, 1998)(holding that burden of proof set forth in N.H. Rev. Stat. Ann. § 491:22-a applies to EnergyNorth's declaratory judgment claims). As such, it must support its position here with materials of evidentiary quality. See In re Varrasso, 37 F.3d 760, 763 n.1 (1st Cir. 1994). Further, "[its] showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." Lopez v.

<u>Corporacion Azucarera de Puerto Rico</u>, 938 F.2d 1510, 1516 (1st Cir. 1991).

## III.

**A.    <u>Evidence Offered by American Home is Admissible Pursuant to the "Former Testimony" Exception to the Hearsay Rule</u>**

American Home bases its summary judgment motion in part on deposition testimony taken in separate lawsuits from the three non-party witnesses.  EnergyNorth has moved to strike the deposition references claiming that they are inadmissible hearsay and therefore cannot be used to support a motion for summary judgment.  <u>See</u> Fed. R. Civ. P. 56(e) (affidavits supporting or opposing a motion for summary judgment shall set forth "such facts as would be admissible in evidence").  American Home disagrees and argues that the deposition testimony is admissible pursuant to Fed. R. Evid. 804(b)(1) as "former testimony."  I address this threshold issue before turning to the merits of the summary judgment motion.

### 1.  <u>Background</u>

Fed. R. Evid. 801(b)(1) excepts former testimony from the general rule barring hearsay in certain limited circumstances. If a witness is unavailable to testify in person, the Rule allows

the admission of former testimony if the opposing party or a "predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination."  Fed. R. Evid. 804(b)(1); see also United States v. Bartelho, 129 F.3d 663, 670 (1st Cir. 1997).  The proponent of the evidence has the burden of proving that the former testimony satisfies each element of the exception.  See Bartelho, 129 F.3d at 670; United States v. Omar, 104 F.3d 519, 522 (1st Cir. 1997).  EnergyNorth argues that the challenged deposition excerpts do not qualify as former testimony under the Rule because American Home has failed to demonstrate both that the deponents are unavailable and that the parties who were present when the depositions were taken qualify as EnergyNorth's "predecessors in interest."

The challenged deposition testimony was taken from (1) Fred C. Zeiloth, former in-house insurance manager for Stone & Webster Management Consultants, Inc., (2) Guy de Repentigny, a former insurance broker from George H. Forster & Company, and (3) L. Barton Cannell, a former insurance broker from Alexander & Alexander.  Stone & Webster is a consulting firm that developed a master insurance program for its utility clients in or around 1950.  EnergyNorth became insured under Stone & Webster's master insurance program on July 30, 1980.  George H. Forster & Company

was Stone & Webster's original insurance broker for the master insurance program. Alexander & Alexander succeeded George H. Forster & Company as Stone & Webster's broker.

Zeiloth's deposition was taken jointly on June 9, 1993, in three actions.[1] Attorneys for the three plaintiffs, all utility companies insured under the Stone & Webster master insurance program, were present at the deposition. Cannell's deposition was taken jointly on May 13, 1993, in the same three actions. Counsel for the three utility companies were present at Cannell's deposition. De Repentigny's deposition was taken jointly on February 26-28, 1991, in two actions.[2] Counsel for both plaintiffs, including Gulf States Utilities Company, which was insured under the same program at issue here, were present at the deposition. The prior lawsuits were all declaratory judgment

---

[1] Zeiloth was deposed in the following actions: <u>Atlanta Gas Light Co. v. Aetna Casualty & Surety Co.</u>, Civil Action No. 1:91-CV-1803-RLV (N.D. Ga.); <u>Green Mountain Power Corp. v. Certain Underwriters at Lloyds, London</u>, Civil Action No. 2:91-CV-385 (D. Vt.); and <u>South Jersey Industries, Inc. v. The Security Insurance Group</u>, Civil Action No. ATL-L-00405-88 (Superior Court of New Jersey, Law Division, Atlantic County).

[2] De Repentigny was deposed in the following actions: <u>American Telephone & Telegraph Co. v. Aetna Casualty & Surety Co.</u>, Docket No. W-56581-88 (Superior Court of New Jersey, Law Division, Essex County); and <u>Gulf States Utilities Co. v. Associated Electric & Gas Insurance Services, Ltd.</u>, Civil Action No. 89-4086 (E.D. La.).

actions brought against the plaintiffs' insurers, seeking coverage under the master insurance policies for costs associated with the clean-up of environmental contamination. With one exception, all of the cases involved contamination caused by gas manufacturing. All four lawsuits also involved policies containing the same definition of occurrence at issue here. See Def.'s Mem. at 9.

## 2. All Three Witnesses are Unavailable For Purposes of Fed. R. Evid. 804

EnergyNorth first argues that the deposition excerpts are not admissible under the former testimony exception because American Home has failed to prove that the deponents are "unavailable." A witness is "unavailable" for purposes of Fed. R. Evid. 804 if the "proponent of a statement has been unable to procure the declarant's attendance . . . by process or other reasonable means." Fed. R. Evid. 804(a)(5); see also United States v. McKeeve, 131 F.3d 1, 9 (1st Cir. 1997). American Home has produced a death certificate for Zeiloth and copies of several letters it sent in unsuccessful efforts to locate Cannell and de Repentigny. In light of this evidence, I am satisfied that all three men are "unavailable" for purposes of Rule 804(b)(1). See Republic Security Corporation v. Puerto Rico Aqueduct and Sewer Authority, 674 F.2d 952, 957 (1st Cir.

1982)(citing <u>Bailey v. Southern Pac. Transp. Co.</u>, 613 F.2d 1385, 1390 (5th Cir. 1980))(trial court has discretion to accept or reject counsel's assertion that declarant is unavailable).

### 3. <u>EnergyNorth's Predecessors in Interest Had an Opportunity and a Similar Motive to Develop the Deponent's Testimony</u>

EnergyNorth next argues that the policyholders who were present when the depositions were taken do not qualify as EnergyNorth's "predecessors in interest." Fed. R. Evid. 804(b)(1) does not require that a legal relationship exist between the party against whom the evidence is being offered and the parties who were present when the former testimony was taken. <u>See</u> <u>Horne v. Owens-Corning Fiberglas Corp.</u>, 4 F.3d 276, 282 (4th Cir. 1993); <u>Dykes v. Raymark Industries, Inc.</u>, 801 F.2d 810, 816 (6th Cir. 1986). Instead, a party to prior litigation will be deemed to be a current party's predecessor in interest for purposes of the Rule when the party to the prior litigation had a "right and opportunity to develop the testimony with similar motive and interest." Fed. R. Evid. 804(b)(1), notes of the advisory committee.

American Home argues that the policyholders in the prior lawsuits qualify as EnergyNorth's predecessors in interest because they had an opportunity and comparable motives to develop

the deposition testimony regarding the authorship of the Stone & Webster master policies. I agree. The five lawsuits, like this case, were declaratory judgment actions in which the policyholders sought coverage for environmental clean-up costs. Four of the five policies at issue in the prior cases involved the same policies at issue here. Further, the deposition testimony of Zeiloth and Cannell makes clear that the source of the policy language was an important issue in the prior lawsuits, as both were questioned about it at length. As such, I find that the parties were "predecessors in interest" to EnergyNorth for purposes of Rule 804(b)(1).

**B.** **Because American Home Did Not Propose the Contested Policy Language, it Should Not be Construed in Favor of EnergyNorth**

As noted above, American Home claims that it did not propose the definition of occurrence used in the policies at issue. Rather, it alleges that EnergyNorth, or one of its agents, was responsible for proposing the "occurrence" language, and thus it should not benefit from the common law rule requiring the construction of ambiguous policy language in favor of the insured. American Home has submitted excerpts of the three depositions referenced above, and other evidence, to support its argument. EnergyNorth counters with portions of the same three

depositions, as well as other evidence.

American Home claims that Stone & Webster proposed the policy language on a take-it-or-leave-it basis, which American Home accepted without alteration. To support its position, American Home has produced copies of a prior Stone & Webster Master Insurance Program policy, dated June 10, 1953, and issued by Lloyds of London, which defines "occurrence" as:

> one happening or series of happenings, arising out of or due to one event taking place during the term of this contract.

Def.'s Ex. B(8). American Home has also produced a June 1, 1971, master insurance program policy issued by a successor insurer, The Home Insurance Company, that uses the same definition of occurrence. See Def.'s Ex. B(9). All three American Home Policies at issue in this case also employ the same definition. See Def.'s Ex. B(5)-(7). In contrast, American Home has established that other policies it issued in 1973, the year it began to provide insurance to utility companies through the Stone & Webster program, and 1980, the year EnergyNorth became an insured under the program, do not define "occurrence" in the same manner as the Stone & Webster policies.[3] See Def.'s Ex.

_____

[3] An American Home policy form used in or around 1973 defined "occurrence" as "an event, including continuous or repeated exposure to conditions, which result in Personal Injury

-11-

B(12),(13).  This evidence provides circumstantial support for American Home's claim that it did not draft the policy language at issue here, but that it instead was provided by Stone & Webster.

Support for American Home's position can also be found in the deposition excerpts it has produced with its motion.  Zeiloth testified that when Stone & Webster changed insurers in 1968, it offered The Home Insurance the policy on a take-it-or-leave-it basis.  See Def.'s Ex. B(1), Zeiloth Dep. at 20:17-21:3.  He stated that "The Home would have to duplicate the policy in its present form completely or it was no deal."  Id. at 20:22-23.  A letter from Zeiloth to Stone & Webster's clients dated April 23, 1968, supports this assertion:

> In an effort to better the rates which
> Lloyd's offered, quotations were requested
> from several domestic insurance companies but
> only The Home Insurance Company indicated any
> real interest.  We understand that this lack

---

or Property Damage neither expected nor intended from the standpoint of the insured.  All such exposure to substantially the same general conditions shall be deemed one occurrence." Def.'s Ex. B(12).  An American Home policy form used in or around 1980 defined "occurrence" as "an event, including continuous or repeated exposure to conditions, which result in Personal Injury or Property Damage during the policy period, neither expected nor intended from the standpoint of the Insured.  All Personal Injury or Property Damage arising out of the continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence."  Def.'s Ex. B(13).

> of interest was primarily due to the low
> retention of many of the participants and the
> refusal by most companies to accept the
> present broad contract.

Def.'s Ex. B(10). Further, both Zeiloth and Cannell stated that when American Home was offered the program in 1973, the relevant policy language was also presented to it on a take-it-or-leave-it basis. See Zeiloth Dep. at 26:6-15; Def.'s Ex. B(3), Cannell Dep. at 14:17-22, 15:18-16:5. This evidence strongly supports American Home's contention that Stone & Webster selected the definition of occurrence used in the policies.

EnergyNorth argues that New Hampshire's special insurance policy construction rules apply even if its agent proposed the relevant policy language because the language had been developed by the insurance industry. I reject this argument. The justification for New Hampshire's common law rule construing insurance policies differently from other contracts is that insurance policy terms generally are developed by the insurer, are imposed on insureds without an opportunity for negotiation, and concern technical matters not generally understood by policyholders. It is reasonable under such circumstances to subject insurers to liability if they require their insureds to agree to policy terms that are ambiguous and reasonably can be interpreted in favor of coverage. The justification for applying

this rule in cases such as this, however, where a highly sophisticated policyholder dictates the terms of the policy to its insurer, is non-existent.  The fact that the insured may have selected policy language that had been developed by other insurers does nothing to alter this analysis.  Accordingly, I decline to apply New Hampshire's special insurance policy construction rules in construing the American Home policies.  Instead, I will construe the relevant policy terms using New Hampshire's general rules of contract interpretation.[4]

**C.** **American Home is Entitled to Summary Judgment When Its Policies Are Construed Using New Hampshire's General Rules of Contract Construction**

A court applying New Hampshire law may consider extrinsic evidence in resolving disputes based on ambiguous contract language.  See Gamble v. University System of New Hampshire, 136 N.H. 9, 13 (1992).  Such disputes cannot be resolved at the summary judgment stage, however, unless a rational factfinder construing all of the relevant evidence in the light most

_____

[4]  American Home argues that I should construe the language in its favor because Stone & Webster, as an agent of EnergyNorth, was responsible for the occurrence definition.  I decline to do so because New Hampshire law ordinarily does not permit a court to construe ambiguous contract language against the drafter.  See Centronics Data Computer Corp. v. Salzman, 129 N.H. 692, 696 (1987)(general rule in contract interpretation is that "no presumptions are to be indulged in either for or against a party who draws an agreement")(internal quotations omitted).

favorable to the non-moving party could resolve the ambiguity only one way.  See id. at 15.  I have previously determined that when the term "event" is construed solely in light of the relevant policy language, it reasonably could be construed to mean either an unintentional act, as EnergyNorth contends, or a discrete incident as American Home argues.  I now reexamine this issue in light of all of the relevant evidence.

This is the rare case where the interpretation of an ambiguous contract term can be determined authoritatively through a motion for summary judgment.  I reach this conclusion for two reasons.  First, although, I have previously determined that the relevant policy language plausibly could be interpreted to cover property damage that develops gradually, the alternative construction suggested by American Home is far more likely even if I restrict my analysis to the relevant policy language.  The American Home policies define an occurrence as "one happening or series of happenings, arising out of or due to one event . . . ." (emphasis added).  The use of the highlighted terms plainly suggest the definition's focus on the occurrence of discrete incidents and strongly support the interpretation of the term "event" suggested by American Home.  While it is conceivable that, notwithstanding these references, a reasonable person might

construe the term more broadly to include gradual property damage, the surrounding language makes this interpretation far less likely than the construction suggested by American Home.

Second, American Home has produced substantial unrebutted extrinsic evidence to support its proposed interpretation. American Home began to insure EnergyNorth's predecessor, Concord Gas, on July 30, 1980. Approximately two months later, a representative of Stone & Webster sent Concord Gas's assistant treasurer a letter which states:

> As you are undoubtedly aware the Environmental Protection Agency has issued restrictive regulations governing the treatment, storage, and disposal of hazardous wastes. <u>Most insurance contracts, including our master comprehensive excess liability policy, do not cover gradual pollution of the environment, but do cover sudden and accidental pollution</u>.
> Because of the possible liability which may result from allegations that a Company has been gradually polluting the environment, we have been reviewing this subject with our Brokers to determine whether it is advisable to amend our current Master policy to incorporate protection for this type of liability or to develop an additional Master policy to provide the particular coverage.

Def.'s Ex. B(17)(emphasis added). This letter clearly put Concord Gas on notice shortly after the first American Home policy was issued that the policy did not cover gradual environmental pollution. EnergyNorth's failure to produce any evidence suggesting that its predecessor ever took issue with

Stone & Webster's interpretation strongly supports American Home's proposed interpretation.

The September 1980 letter referenced above was followed five months later by a letter describing Stone & Webster's new Environmental Impairment Liability Insurance ("EIL"). The letter, addressed to the same Concord Gas official and dated February 9, 1981, noted that Stone & Webster would cancel and rewrite its master insurance as of March 2, 1981, and add EIL insurance to its new policy, effective March 2, 1981 (policy number CE338 16 82AB). See Def.'s Ex. B(17). Stone & Webster included a brochure describing the new master policy, along with the EIL insurance, with the February 1981 letter. See id. The brochure states, under the heading of "New Coverage," that:

> The exclusion of gradual (non-sudden/non-accidental) pollution coverage represents a serious gap, leaving companies and their offices vulnerable. To help protect your assets, Stone & Webster developed Environmental Impairment Liability coverage which will be automatically incorporated into our program as of March 2, 1981. Coverage will include clean-up costs; loss control services are also available.

Id. The EIL insurance was added to the master policy as a separate section, leaving much of the original master CEL policy - including the "occurrence" language - unchanged. See Def.'s Ex. B(6)(policy number CE338 16 82AB). EnergyNorth applied for

and received the EIL insurance.[5]

New Hampshire law permits a court to consider a party's statements and conduct both before and after the formation of a contract when construing ambiguous contract terms. See White v. Ford, 124 N.H. 452, 455 (1984); Auclair v. Bancroft, 121 N.H. 393, 395 (1981); Spectrum Enterprises, Inc. v. The Helm Corp., 114 N.H. 773, 776 (1974). In the present case, the only relevant extrinsic evidence that the parties have produced expressly supports American Home's interpretation of the disputed policy terms. In the absence of any contrary information, this evidence is sufficiently strong to render other interpretations irrational. Accordingly, I determine as a matter of law that the American Home policies at issue in this case do not cover property damage resulting from gradual environmental pollution.

---

[5] While the EIL insurance appears to cover EnergyNorth's claims, American Home notes that it applies only to claims made against the insured and reported to the insurer during the policy period. Thus, American Home states, any coverage EnergyNorth seeks here must be pursuant to the provisions contained in the CEL portion of the master policy, which includes the ambiguous "occurrence" definition. American Home states that it has asked EnergyNorth to clarify that it is not seeking coverage under the EIL section of Stone & Webster policy numbers CE338 16 82AB and CE364 9251, but that EnergyNorth has not responded. I take no position as to whether the EIL section of those two policies covers EnergyNorth's claims. I focus my decision here solely on EnergyNorth's claims pursuant to the comprehensive excess liability section of the policies.

As all of the property damage at issue here was the result of such pollution, American Home is entitled to summary judgment.

## IV.

For the reasons set forth above, I deny EnergyNorth's motion to strike (document no. 183) and grant American Home's renewed motion for summary judgment (document no. 179).

SO ORDERED.

_____
Paul Barbadoro
Chief Judge

July 1, 1999

cc:  Bruce W. Felmly, Esq.
     Robert Gallo, Esq.
     Vincent Ziccolella, Esq.
     Richard Bryan, Esq.
     Emily Rice, Esq.
     Paul Leodori, Esq.
     John L. Putnam, Esq.
     Jeffrey Osburn, Esq.
     John Guarascio, Esq.
     Michael Aylward, Esq.